The EMERY WATERHOUSE COMPANY

v.

Gilbert LEA and Craig C. Milne, Glenn
M. Desmond and David Adams, DBA
Emery Associates.

Supreme Judicial Court of Maine.

Argued June 17, 1983.

Decided Nov. 4, 1983.

Norman & Hanson, Peter J. DeTroy, III (orally), James D. Poliquin, Portland, for plaintiff.

Hunt, Thompson & Bowie, James M. Bowie (orally), Rebecca H. Farnum, M. Roberts Hunt, Portland, for David Adams, Milne, Desmond.

Hewes, Culley, Feehan & Beals, Stephen C. Whiting (orally), Stephen W. Devine, Portland, for Gilbert Lea.

Before McKUSICK, C.J., NICHOLS, ROBERTS, VIOLETTE and WATHEN, JJ., and DUFRESNE, A.R.J.

DUFRESNE, Active Retired Justice.

The defendants, Gilbert Lea and Emery Associates, were the owners respectively of adjacent buildings on Middle Street, in Portland, Lea owning two of the buildings identified, for purposes of convenience, as buildings # 1 and # 2, while buildings # 3 and # 4 were owned by Emery Associates, hereinafter referred to as the Associates. The Associates had leased from Lea the first and second floors of building # 2 together with part of the basement, and had in turn subleased the same to the plaintiff, The Emery Waterhouse Company (Emery Waterhouse). Emery Waterhouse had also leased from the Associates the basement as well as the first and second floors of building # 3. Sometime during the Christmas week-end (December 26 to December 29, 1975), several pipes on the third floor of building # 3 ruptured and burst, releasing large volumes of water which flowed onto the property of Emery Waterhouse located on the first and second floors of the building.

The plaintiff on November 24, 1976, brought suit against the defendant owners to recover damages for the injury to its property including loss of business profits. In its action, Emery Waterhouse, which had joined the Union Oil Company as a defendant, claimed that the heating system had been negligently and carelessly disconnected from the third floor of building # 3 without properly draining the piping system on that third floor. A Superior Court jury in Cumberland County returned a verdict in favor of Emery Waterhouse, the plaintiff, against the defendants, Lea and the Associates, in the amount of $78,388.43 as compensation for the plaintiff's property damage and lost profits resulting from the bursting of the water pipes on the third floor of building # 3. The jury exonerated the Union Oil Company, but no appeal has been taken from that aspect of the case. The other three parties appeal from the ensuing judgments affecting them inter se. We affirm these judgments as corrected.

## I. Facts

The reference 4-building complex on Middle Street in Portland at the time of the water-loss incident had interconnecting heating systems. The furnace in the basement of building # 2 owned by and under the control of the defendant Lea would heat all of building # 2 and the second and third floors of building # 3. The furnace in the basement of building # 4 would heat all of building # 4 and the basement and first floor of building # 3. The heating systems involved circulating hot water. Switches by the furnaces controlled the circulation and temperature of the water. Switches on the floors controlled blowers that blew air over the water pipes.

Building # 2 was bought by Lea from the Associates in September, 1975, the purchase and sale agreement providing that Lea assumed all responsibility for making building # 2 self-sufficient, including, by express reference to it, disconnecting the heating system of building # 2 from the adjacent building # 3. Lea testified that this provision was inserted in the purchase and sale agreement to protect him "from spending any money to heat building number 3 in any way, shape or form." There was no specific agreement, however, concerning the drainage of the water pipes if the heat supply to building # 3 were disconnected.

After the sale of building # 2, the Associates took a lease from their buyer, Lea, of

the basement and the first and second floors of the building; Lea retained access to the furnace in the basement through building # 1, which he already owned. The Associates as lessors, so far as Emery Waterhouse is concerned, were responsible for heating the areas taken over by Emery Waterhouse under the leases. Even though the third floor of building # 3 had not been leased by Emery Waterhouse from the Associates, Emery Waterhouse, so the evidence showed without dispute, had permission from the Associates to use it for storage. The plaintiff had access to the thermostats in building # 3 and its employees were in the practice of turning down the heat temperature at night and on weekends.

On December 29, 1975, after a long holiday week-end, it was discovered that the heating pipes on the third floor of building # 3 had frozen and burst, causing extensive water damage to the Company's inventory located on the floors below. By stipulation, the inventory loss was put at $63,388.43. The plaintiff's treasurer testified to lost business profits in the amount of $16,950.00.

## II. *Procedural Aspect*

The complaint against Lea, the Associates and Union Oil asserted that the damages to the plaintiff's property, including its business loss, were due proximately to the negligence of the three defendants. Each defendant cross-claimed against the other two for contribution. The Associates counter-claimed against Emery Waterhouse, the plaintiff, on the basis of their right to indemnity under the lease contract, and additionally raised the affirmative defense of release from liability. Before trial, the parties did agree that the rights and liabilities arising out of the indemnity and release clauses of the lease agreement between Emery Waterhouse and the Associates presented legal issues for the court and not the jury to determine. In its special verdict, the jury apportioned fault as follows: Emery Waterhouse, zero percent; Union Oil Co., zero percent; the Associates, twenty-five percent; Lea, seventy-five percent. The jury returned a verdict against the defendants, Lea and the Associates, in the amount of $78,388.43.

The court subsequently determined that the indemnity clause contained in the lease agreement between Emery Waterhouse and the Associates did not protect the owner-lessor Associates against their own negligence. The court further ruled that under the lease the Associates were released from liability to Emery Waterhouse in the amount of $53,388.43, the sum paid to the plaintiff by its own insurer.

The ensuing judgment, as docketed on May 14, 1982, reflects the following pertinent information: against the defendant, Lea, judgment in favor of the plaintiff, Emery Waterhouse, in the amount of $78,388.43, together with interest and costs; against the defendants, Emery Associates, judgment in favor of the plaintiff, Emery Waterhouse, "jointly and severally with the afore-mentioned defendant, Gilbert Lea," in the amount of $25,000.00, together with interest and costs; against the defendants, Emery Associates, judgment in favor of the defendant, Lea, for contribution in the amount of $6,250.00; against the defendant, Lea, judgment in favor of the defendants, Emery Associates, for contribution in the amount of $18,750.00.

Subsequent motions for judgment n.o.v., for a new trial, and to alter or amend the judgment pressed by the defendants, Lea and Emery Associates, were denied.

## III. *Issues on Appeal*

The parties bring up for review the sufficiency of the evidence to support the verdict and ensuing judgments, the propriety of the trial justice's ruling on certain opinion evidence, the court's conclusion respecting the questions of indemnity and release under the lease agreement. The form of the judgment also is challenged as not exemplifying the jury verdict.

### A. *Sufficiency of the Evidence*

Both defendants, Lea and the Associates, rely on *Pratt v. Freese's, Inc.,* 438 A.2d 901

(Me.1981), to support their argument, that the Superior Court justice erred in denying their respective motions for directed verdicts, for judgments n.o.v., and for new trials, claiming that the plaintiff, Emery Waterhouse, merely proved several theories of causation under which the damaging incident could have been brought about, some of which, so they contend, were equally probable and would exonerate the defendants. We disagree.

In *Pratt,* the plaintiff husband sustained personal injuries while he was attempting to enter the elevator in Freese's department store in Bangor. In that case, no evidence was introduced which tended to prove that at the time of the accident the elevator was, or was about to become, defective in some particular condition which the defendant could have remedied by the use of due care. Causes not involving negligence of the defendant, which potentially could be responsible for the accident, were not excluded by the evidence presented and placed the jury in a position of sheer speculation if it were to infer that the accident was due to some negligent act of one of the defendants simply because the accident did in fact occur. We noted in *Pratt* that, "[i]f, when examined in the light of the known facts, two or more theories remain equally probable and equally consistent with the evidence, the selection of one to the exclusion of others would rest upon mere surmise and conjecture," (quoting *Hersum v. Kennebec Water Dist.,* 151 Me. 256, 263, 117 A.2d 334, 338 (1955)). 438 A.2d at 904–05.

■ Although the plaintiff did not introduce direct evidence of the defendants' involvement in causing the bursting of the water pipes on the third floor of building # 3 on the Christmas week-end of 1975, the record does present a circumstantial factual scenario from which a jury could rationally infer that *but for* the action of the defendant, Lea, and the lack of due care on the part of the defendants, the Associates, the accident would not have happened. The jury conclusion that the defendants, Lea and the Associates, were the proximate cause of the accident was, not only a logical inference from the evidentiary fact pattern, but the only reasonable explanation for the accident, to the exclusion of all other conjectural theories advanced by the parties.

Indeed, the evidence is plenary, that the defendant Gilbert Lea, did not want to supply heat to the third floor of building # 3. From the time of the purchase and sale agreement of building # 2, Lea knew that it was his responsibility to make building # 2 self-sufficient, to the extent of disconnecting the heating system to the second and third floors of the adjacent building. He testified repeatedly, and this attitude has been termed an obsession on his part by the plaintiff, that

"my intention, I'll say, was to have no heat going into the building next door, period."

"My impression was that I had no agreement with anybody to supply anything to buildings 3 or 4 of any kind, nature, sort or description."

"My instructions with Union Oil were to make sure that no heat goes into that building because the intention is not to get any heat into building number 3."

According to Lea's accountant, Union Oil was told in 1975 to disconnect the heat supply to building # 3. In his deposition, read at trial, Lea admitted that "if I hadn't asked Union Oil to cut out the ... thing [the heat], the pipe never would have broken." The jury, from the evidence, could further find that Lea had access to his furnace in building # 2, where the cut-off valves for the heat that was being furnished to the second and third floors of building # 3 were located; that the turning off of these cut-off valves on the occasion of the reference Christmas week-end would have caused the bursting of the water pipes; that these valves were in the off position on December 29, 1975, after the accident was discovered. The evidence produced before the triers of the facts, together with every reasonable inference arising therefrom, when viewed in the light most favorable to the plaintiff, presented a prop-

er issue for jury determination respecting the defendant Lea's responsibility for the water damage to the plaintiff's property.

The same can be said of the defendants, Emery Associates, who as lessors of building # 3 had obligated themselves to provide heat for the building and to maintain the plumbing in the building in good repair. The jury could reasonably infer from the evidence that the Associates knew that under the purchase and sale agreement between them and Gilbert Lea, Mr. Lea had the right, and the responsibility, to sever the heating system of building # 2 from its connection with building # 3 and that he was threatening to exercise his rights to do so. Indeed, Mr. Milne, one of the defendant Associates, testified that in the early fall of 1975 after the building # 2 had been sold, the defendant Lea had approached him indicating his concern about the expense of providing heat to the upper floors of building # 3 which he did not own and had told him that he was considering doing something about it. Mr. Milne further testified he did expect at the time that the heat to the upper floors of building # 3 would be discontinued and in anticipation of such happening he caused the sprinkler system in the building to be checked to protect it against the eventuality, but, concededly, he did not at the time have the water pipes inspected to determine their vulnerability under such circumstances or the need for draining them to protect the plaintiff's inventory. The totality of the evidence, when viewed in the light most favorable to the plaintiff, reflected, as against the defendant Associates, a factual pattern of negligence which the jury could rationally conclude proximately contributed to the plaintiff's loss.

Our review of the evidence compels the conclusion that the jury was justified in finding causative fault on the part of both defendants, and that the trial justice committed no reversible error in refusing to take the case from the jury or to set aside the verdict, or, in the alternative, to grant a new trial. *See Jackson v. Frederick's Motor Inn,* 418 A.2d 168 (Me.1980).

B. *Opinion Testimony*

Both defendants, Lea and the Associates, contend that the trial justice erred in permitting Craig C. Milne, a real estate appraiser, a party defendant and former partner in Emery Associates, to give opinion testimony concerning what caused the pipes to freeze. They argue that Mr. Milne's opinion was neither based on his own first-hand knowledge, nor helpful to the jury in resolving the issue of causation. The foundation for the stated opinion was said to be by the witness Milne himself, what he was told by Union Oil people about the condition of the boiler and the heat exchanger in building # 2 and his own observations of what he saw in building # 3 on December 29, 1975, after the accident was discovered. It is undisputed that Mr. Milne was a non-expert witness, that he did not possess any special knowledgeability about the specific heating system existing in buildings # 2 and # 3, nor about heating systems in general. He was permitted, over objections, to testify to the jury that in his opinion "the heat had been shut off to building # 3, the upper floors, by somebody at the source in building # 2 causing the pipes to freeze. But it was not properly done and drained."

Rule 701 of the Maine Rules of Evidence provides that

"[i]f the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue."

Mr. Milne asserted that his opinion was based both on his own observations of the material facts shortly after the accident and what information he obtained at the time about the heating system and the piping connections in buildings # 2 and # 3 from Union Oil people, referring to Edward Coombs, the Union Oil Company's employee, who at Milne's request had inspected the premises following the incident.

■ We agree that ordinarily a lay witness cannot, under the guise of an opinion, give his deductive conclusion from what he saw and found out on visiting the scene of an accident after the accident has happened. To allow such witness to state what in his opinion caused the damage amounts to nothing more than permitting that witness to invade the prerogative of the jury and decide for it an ultimate issue in the case. *See Wood v. Michigan Millers Mutual Fire Insurance Co.,* 243 N.C. 158, 90 S.E.2d 310, 312 (1955).

■ In Maine, however, the traditional prohibition against the giving of opinion testimony on an ultimate issue of fact was removed by Rule 704 of the Maine Rules of Evidence.[1] Whether to allow in evidence an opinion on an ultimate issue, absent other grounds of inadmissibility of the testimony, rests within the sound discretion of the presiding justice. *Minott v. F.W. Cunningham & Sons,* 413 A.2d 1325, 1330 (Me.1980).

■ Thus, we note that Mr. Milne's opinion respecting the cause of the pipe bursting was not rationally based wholly and solely on the perceptions he acquired through his personal observations made shortly after the incident, but also took into consideration the information supplied to him in large detail by Mr. Coombs, a recognized expert in the field of heating systems, and under the circumstances was in violation of Rule 701, M.R.Evid. Also, Mr. Milne's opinion as such was of no particular aid to the jury in making the determination which it was theirs to make on the ultimate factual question of the cause of the bursting pipes.

Nevertheless, in the context of the evidentiary scenario in the instant case, where Mr. Coombs did testify to the factual information which Mr. Milne took into consideration in reaching the conclusion which he communicated to the jury respecting the cause of the bursting pipes, we cannot say on this record that Milne's opinion testimony was demonstrably prejudicial and reversible error. *See Johnson Aircrafts v. Wilborn,* 190 S.W.2d 426, 430–31, (Tex.Civ.App.1945). *But see Levin v. Hilliard,* 266 S.W.2d 573, 577 (Mo.1954).

### C. Indemnity

The defendant, Emery Associates, claimed in their counterclaim against Emery Waterhouse that under the existing lease agreement between them the plaintiff was obligated to indemnify the Associates from any and all damages to its property arising from or out of any occurrence in, upon or at the leased premises, and that such broad and comprehensive provision afforded the Associates with complete indemnity, including indemnity for damages caused by their own negligence.[2] The justice below, however, found that the indemnity clause of the lease did not protect the Associates from responsibility for their own negligence and ruled that under the lease agreement Emery Waterhouse was not obligated to indemnify the Associates who had been found by the jury jointly and severally liable for the damages caused to the plaintiff's property by the bursting water pipes. In this, there was no error.

1. Rule 704, M.R.Evid. provides:

 Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

2. Article IX of the lease provides as follows:

 (a) Tenant [Emery Waterhouse] will indemnify Landlord [Emery Associates] and save it harmless from and against:

 1. any and all claims, actions, damages, liability and expense in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in, upon or at the leased premises, or
 2. the occupancy or use by Tenant of the leased premises or any part thereof or
 3. occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, business invitees or guests.

 In case Landlord shall, without fault on its part, be a party to litigation commenced by or against Tenant, then Tenant shall protect and hold Landlord harmless and shall pay all costs, expenses and reasonable attorney's fees that my [sic] be incurred or paid by Landlord in enforcing the covenants and agreements in this lease.

■ Indemnity clauses to save a party harmless from damages due to negligence may lawfully be inserted in contracts such as the lease entered into between Emery Associates and Emery Waterhouse, and such clauses are not against public policy. *See Denaco v. Blanche,* 148 Me. 120, 124–25, 90 A.2d 707, 709 (1952); *E.L. Cleveland Co. v. Bangor & Aroostook Railroad Co.,* 133 Me. 62, 173 A. 813 (1934).

■ But, when purportedly requiring indemnification of a party for damage or injury caused by that party's own negligence, such contractual provisions, with virtual unanimity, are looked upon with disfavor by the courts, and are construed strictly against extending the indemnification to include recovery by the indemnitee for his own negligence. *Doyle v. Bowdoin College,* 403 A.2d 1206, 1208–09 (Me.1979); *United States v. Seckinger,* 397 U.S. 203, 211–12, 90 S.Ct. 880, 885, 25 L.Ed.2d 224 (1970). It is only where the contract on its face by its very terms clearly and unequivocally reflects a mutual intention on the part of the parties to provide indemnity for loss caused by negligence of the party to be indemnified that liability for such damages will be fastened on the indemnitor, and words of general import will not be read as expressing such an intent and establishing by inference such liability. *Freed v. Great Atlantic & Pacific Tea Co.,* 401 F.2d 266, 270 (6th Cir.1968); *Kroger Company v. Giem,* 215 Tenn. 459, 387 S.W.2d 620, 626 (1964); *Jewett v. Capital National Bank of Austin,* 618 S.W.2d 109, 112 (Tex.Civ.App.1981).

■ Article IX(a) of the lease (*see* note 2) does provide indemnity rights to the defendant Associates as landlord against Emery Waterhouse, their tenant, in broad and general terms, such as indemnifying them against *any and all claims* ... in connection with ... damage to property arising from or out of *any occurrence* in, upon or at the leased premises. But nothing therein indicates or compels the inference that the parties meant to include damage from the indemnitee's own negligence, *i.e.* from the Associates themselves, and we decline to supply it. *See Brogdon v. Southern Railway Company,* 384 F.2d 220, 223 (6th Cir. 1967). The article itself inferentially suggests otherwise by specifically providing indemnity for litigation fees and expenses incurred by the Associates when made a party in actions commenced by or against Emery Waterhouse, the tenant, *if without fault on the part of the Associates.*

## D. Release (Emery Associates)

The parties stipulated at trial that, pursuant to the insurance policy which it carried on its personal property in inventory with The Hartford Fire & Insurance Company, Emery Waterhouse was paid by its insurer the amount of $53,388.43, which reflected payment in full of the net amount of the plaintiff's damages suffered as a result of the December 29, 1975, occurrence less salvage and policy deductible. The stipulation further admitted that its insurer has not denied coverage to Emery Waterhouse respecting the reference loss, that it made no claim of any reservation of rights and that the plaintiff and Hartford did not enter into any non-waiver agreement with regard to any disputes over claims arising from the event. The stipulation, however, adds that, *in the instant action,* Hartford as Emery Waterhouse's insurer is claiming a subrogation interest to the extent of the monies it paid its insured as a result of the damages caused by the bursting water pipes.

The trial justice reasoned that the limitational condition placed upon the release clause of article IX(b) of the lease agreement between Emery Waterhouse and the Associates,[3] to the effect that

any persons claiming through the other by right of subrogation or otherwise for any loss or damage either to the leased premises, as to Landlord, or the properties of the Tenant, as to Tenant, caused by fire or any of the extended coverage casualties, notwithstanding that such

---

**3.** Article IX(b) of the lease agreement provides as follows:

(b) Landlord [Emery Associates] and Tenant [Emery Waterhouse] hereby release each other, to the extent of their respective insurance coverage, from any and all liability to the other or

*this release shall be in force and effect only with respect to loss or damage occurring during such time as . . . Tenant's . . . policies of fire or extended covering insurance shall contain a clause to the effect that this release shall not affect said policies or the right of the insured to recover thereunder,*

was intended by the parties to afford them the opportunity to secure such a clause in their respective insurance contracts from their respective insurers and thereby assure that the release clause inserted in the lease agreement would not affect their ability to recover from their own insurance policy in case of loss.

Emery Waterhouse, the plaintiff, did receive payment of the amount of its loss to which it was entitled under the terms of the Hartford insurance policy. The trial court concluded that, under such circumstances, the stated limitational condition, entered into only for purposes of adjusting the parties' insurance policies to their mutual release-of-liability undertaking under the release clause of the lease, had become immaterial and the mutual release provisions of article IX(b) of the lease became operative and effectively released the Associates from liability to the extent of the plaintiff's insurance recovery. In this, there was no error.

■ The issue presented is whether the tenant-plaintiff, Emery Waterhouse, who, prior to its water-damage loss and by an exculpatory clause in the lease agreement released its landlord, the defendant Emery Associates, from liability for any loss resulting from the landlord's negligence, may set up, as a defense to the landlord's counterclaim for exculpation in this case, the absence in the plaintiff's current insurance policy with Hartford of such a specific clause as mentioned in article IX(b) of the

lease agreement. We think not. We affirm the decision of the justice below and hold that the absence of such a clause from the insurance policy or one expressly prohibiting the insured from entering into any exculpatory agreements does not compel a forfeiture by the defendant Associates of their rights under the exculpatory clause, where the plaintiff-insured was not in fact impeded in any way from recovering its losses under the insurance contract.

■ Whether or not an insurance policy expressly reserves subrogation rights, it is the universal rule that upon payment of a loss the insurer is entitled to pursue those rights against a third party whose negligence or wrongful act caused the loss. But an insured may defeat the insurance company's rights of subrogation by entering into an agreement of release with the wrongdoer before the policy is issued, or, as in the instant case, after the policy is issued, but prior to loss. *See Great Northern Oil Co. v. St. Paul Fire & M. Ins. Co.,* 291 Minn. 97, 189 N.W.2d 404, 406–07 (1971).

■ Indeed, it is a well-settled rule of law that where an insured settles with or releases a wrongdoer from liability for a loss *before payment* of the loss has been made by the insurance company, the latter's right of subrogation is thereby destroyed. The lessee, Emery Waterhouse, by the terms of the lease which was in effect at the time of the loss, released the lessor, Emery Associates, to the extent of the lessee's insurance coverage, from *any and all* liability to the lessee or to any persons claiming through the lessee by right of subrogation such as the lessee's insurance carrier for *any* loss or damage to the properties of the lessee caused by *any* of the extended-coverage casualties. *See International Insurance Company v. Medical-Professional*

---

fire of [sic] such casualty shall be due to the negligence of the other or the other's servants, agents or employees, provided, however, this release shall be in force and effect only with respect to loss or damage occurring during such time as Landlord's or Tenant's, as the case may be, policies of fire or extended cover-

ing insurance shall contain a clause to the effect that this release shall not affect said policies or the right of the insured to recover thereunder. Tenant shall upon request of Landlord furnish Landlord with evidence of compliance with this Article.

*Bldg.,* 405 S.W.2d 867, 870 (Tex.Civ.App. 1966); *Gerlach v. Grain Shippers' Mut. Fire Ins. Ass'n,* 156 Iowa 333, 136 N.W. 691, 693 (1912).

Such exculpatory agreements releasing a party to the agreement from liability caused by that party's own negligence do not contravene public policy and are enforceable on the occasion of a subsequent loss even though the agreement itself was entered into after the issuance of the policy. *Id.* at 407. *See also E.L. Cleveland Co. v. Bangor & Aroostook Railroad Company,* 133 Me. 62, 69–70, 173 A. 813, 815–16 (1934). Considerations of equitable principles upon which rights of subrogation depend (*see Leavitt v. Railway Co.,* 90 Me. 153, 160, 37 A. 886, 888, 38 L.R.A. 152 (1897)) do not in the instant case tip the scale against the enforceability of the exculpatory clause, but rather favor its application, since the potential subrogee insurance carrier did pay the loss without reservation and the subrogor-insured's rights were not, as a matter of fact, affected by the exculpatory clause of the lease agreement or the absence of a permissive release clause in the insurance contract. As between Emery Waterhouse and Emery Associates, the insured plaintiff was duty bound to secure from its insurer the necessary modification of its insurance policy to bring it in compliance with the requirement of article IX(b) to the effect that a permissive release clause be contained in the insurance contract, the evidence of which the plaintiff-tenant had agreed to furnish the defendant-landlord upon request when desired. The equities in the case tip on the side of the defendant Emery Associates.

### E. *Lea's Claim of Release*

The defendant Lea claims that the factual release of his codefendant, Emery Associates, to the extent of the plaintiff's recovery of the insurance proceeds in the sum of $53,388.43 should operate as discharging him of liability to the plaintiff in an equal amount. The justice below ruled otherwise and we agree.

Lea bases his entitlement to this partial release upon the provisions of 14 M.R.S.A. § 163, which state as follows:

> Whenever a person seeks recovery for a personal injury or property damage caused by 2 or more persons, the settlement with or release of one or more of the persons causing the injury shall not be a bar to a subsequent action against the other person or persons also causing the injury.

Evidence of settlement with a release of one or more persons causing the injury shall not be admissible at a subsequent trial against the other person or persons also causing the injury. After the jury has returned its verdict, the trial judge shall inquire of the attorneys for the parties whether such a settlement or release has occurred. If such settlement or release has occurred, the trial judge shall reduce the verdict by an amount equal to the settlement with or the consideration for the release of the other persons.

■ The rule at common law is that the release of one of several tortfeasors releases the others. *Gilpatrick v. Hunter,* 24 Me. 18, 19, 41 Am.Dec. 370 (1844); *Mitchell v. Libbey,* 33 Me. 74 (1851); *Wells v. Gould and Howard,* 131 Me. 192, 194, 160 A. 30 (1932). This is true though the wrongdoers are severally, rather than jointly, liable for the injury. *Wells,* 131 Me. at 194, 160 A. 30. *Cleveland v. Bangor,* 87 Me. 259, 264–65, 32 A. 892 (1895). *But see Steeves v. Irwin,* 233 A.2d 126, 134, 135–36 (Me.1967). *See also Dwy v. Connecticut Co.,* 89 Conn. 74, 92 A. 883, 884–85 (1915).

■ The textual language of 14 M.R.S.A. § 163 indicates a clear intent on the part of the Legislature to modify the rule at common law that a release of one joint tortfeasor operates as a discharge of the other joint tortfeasors. The overall scheme and purpose of this section is undoubtedly to promote settlements in multiple-party tort cases by depriving such settlements or releases of one tortfeasor of their common-law characteristic of absolutely discharging all other joint and several tortfeasors, per-

mitting a subsequent action against the other parties causing the injury to be tried without the evidence of the settlement or release being disclosed to the trier of facts, and, after favorable verdict in favor of the injured party-releasor, having that verdict against the other tortfeasor reduced by an amount equal to the consideration received in the prior settlement or release. The statute, by providing a mechanism of mandatory set-off of the consideration paid to the injured party by one tortfeasor in settlement or release of all claims against the amount received in a subsequent verdict against one or more of the other tortfeasors indicates that the Legislature did not intend the statute to be applicable to anticipatory damage releases such as contractually entered into in the instant case by Emery Waterhouse and Emery Associates some three years before the damage occurred, but shows that the specific legislation contemplated settlements or releases made or entered into by the parties after the damage has occurred.

 Statutes in derogation of the common law are to be strictly construed, and the Legislature will not be presumed to intend any innovation upon the common law further than the necessity of the case requires. *See Sutherland on Statutory Construction,* Sec. 290, page 374. *Palmer v. Town of Sumner,* 133 Me. 337, 340, 177 A. 711, 713 (1935). *See also Blier v. Inhabitants of Town of Fort Kent,* 273 A.2d 732, 734 (Me.1971). It is a well-settled rule in the construction of statutes that legislative enactments will be construed to alter the common law only to the extent that the Legislature has made that purpose clear. *Knowles v. Ponton,* 96 R.I. 156, 190 A.2d 4, 6 (1963); *Saunders v. First National Realty Corporation,* 245 A.2d 836, 838 (D.C.App. 1968); *Davis v. Walker,* 170 Neb. 891, 104 N.W.2d 479, 489 (1960).

Hence, we hold that Lea was not entitled to have the amount of the verdict rendered against him in favor of Emery Waterhouse reduced, pursuant to 14 M.R.S.A. § 163, by the amount set off to Emery Associates against their own judgment liability by reason of the anticipatory mutual releases contained in their lease agreement with Emery Waterhouse. The trial justice was correct in his ruling on that score.

### F. *Cross-Claims for Contribution*

 The trial justice erred, however, in calculating the amounts to which Lea and Emery Associates are entitled from each other on their cross-claim for contribution. The justice caused judgment to be entered for Lea against the Associates for twenty-five percent of $25,000.00, the amount for which Lea and the Associates were jointly and severally liable to Emery Waterhouse. Judgment for seventy-five percent of $25,-000.00 was awarded to the Associates against Lea. Lea and the Associates are properly liable to each other in contribution for seventy-five and twenty-five percent, respectively, of the *entire amount of the judgment,* $78,388.43, and not simply for those percentages of the remainder of the judgment after the amount of the Emery Associates' release has been subtracted.

The release in the lease between Emery Waterhouse and Emery Associates concerns only those two parties and plays no role in the determination of rights under the cross-claims for contribution between the Associates and Lea. Lea was in no way involved in that release arrangement and should not benefit from it in any way. Fairness, however, dictates that he should also be kept immune from any adverse effect as a result of that contract.

We noted long ago that "[c]ontribution is not contractual. It is an equitable right founded on acknowledged principles of natural justice and enforceable in a court of law." *Hobbs v. Hurley,* 117 Me. 449, 451, 104 A. 815, 816 (1918). In adopting comparative contribution as the law of Maine, we further emphasized that there is "no reason why in logic or in justice the law should expect that the joint tortfeasor should ultimately be required to contribute more—or less—than a share of the total damages proportionate to his causal fault." *Packard v. Whitten,* 274 A.2d 169, 180 (Me.1971).

In two cases analogous to the present case, we applied principles of equity to prevent an unjust result with regard to contribution among parties. In *Bedell v. Reagan,* 159 Me. 292, 192 A.2d 24 (1963), we held that interspousal immunity would not prevent contribution from a tortfeasor immune from direct suit. Otherwise, we noted, the "third party would be unjustly required not only to compensate for his own fault but also to pay the pecuniary equivalent of the husband's wrong. The third party would be penalized because of the marital fact ..." 159 Me. at 296, 192 A.2d at 26. We concluded that the policies supporting interspousal immunity were not sufficiently "compelling as to vindicate such an incongruity," 159 Me. at 297, 192 A.2d at 26, and that those policies would, in any event, not be frustrated to "any insuperable degree" by allowing contribution. 159 Me. at 299–300, 192 A.2d at 28.

In *Otis Elevator Co. of Maine v. F.W. Cunningham & Sons,* 454 A.2d 335 (Me. 1983), we held that a joint tortfeasor, directly liable to the injured person, could seek contribution from another joint tortfeasor who was not adjudged liable to the injured person because of the rule of fault comparison under which that case was tried by agreement of the parties. 454 A.2d at 340. Applying the *Bedell* analysis,[4] we concluded that policies underlying the Maine version of modified comparative fault had "no application to considerations of what is just between joint tort-feasors." 454 A.2d at 340; *see also Roberts v. American Chain & Cable Co., Inc.,* 259 A.2d 43, 49 (Me.1969) (purposes of workers' compensation act would be frustrated by allowing contribution from a previously immune employer). We stated that once an injured party has been paid his judgment by a joint tortfeasor

directly liable to that party, "considerations shift solely to concerns of what is fair between tort-feasors whose negligence collectively caused injury to another." 454 A.2d at 339. Relying on *Packard,* we stated that under the circumstances in *Otis,* it was more unfair to require a tortfeasor to pay more than his proportionate share of the damages than to require a tortfeasor not adjudged liable to contribute his proportionate share of the damages. 454 A.2d at 340.

Emery Waterhouse and Emery Associates entered into a valid contract for the release of the Associates from liability to Emery Waterhouse to the extent of insurance coverage. The fundamental principle of freedom of contract requires recognition of the release provision vis-a-vis the parties to that contract. That principle will not be in any way undermined by refusing to enforce the provisions of that release against Lea, a non-party to the Emery Waterhouse-Emery Associates contract. But, by permitting the Associates to contribute to Lea much less than the Associates' proportionate share of the total judgment,[5] we would frustrate the sound principle that contribution by joint tortfeasors shall be in proportion to their contribution to the damage. *Packard,* 274 A.2d at 181; *see Otis,* 454 A.2d at 340.

The error is easily corrected by recalculating, on the basis of the total judgment entered in favor of the plaintiff, the amount of contribution to which the Associates and Lea are entitled from each other. *See Dongo v. Banks,* 448 A.2d 885, 894 (Me.1982).

The entry is:

Appeal of Gilbert Lea denied in part and sustained in part.

Cross-appeal of Emery Waterhouse Company denied.

---

4. Because both Lea and the Associates were found liable to the plaintiff, we need not discuss the viability of the "common liability" rule as a prerequisite to contribution. *Otis,* 454 A.2d at 338–39; *Roberts v. American Chain & Cable Co., Inc.,* 259 A.2d 43, 47–48 (Me.1969).

5. Lea was awarded judgment of $6,250.00 against the Associates. That sum is approximately eight percent of $78,388.43.

Cross-appeal of Craig C. Milne, Glenn M. Desmond, and David Adams, d/b/a Emery Associates, denied.

Judgment of the Superior Court is modified to read as follows:

In the complaint of the Plaintiff, The Emery Waterhouse Company, against Craig C. Milne, Glenn M. Desmond, David Adams, d/b/a Emery Associates, and Gilbert Lea, et al., judgment is entered in favor of the Plaintiff, The Emery Waterhouse Company, and against the Defendant, Gilbert Lea, in the amount of $78,388.43, together with interest and costs; as to the amount of $25,000.00 of said judgment of $78,388.43 and not in addition thereto, judgment is entered in favor of the Plaintiff, The Emery Waterhouse Company, and against the Defendants, Craig C. Milne, Glenn M. Desmond and David Adams, d/b/a Emery Associates in said amount of $25,000.00, together with interest and costs, jointly and severally with the aforementioned Defendant, Gilbert Lea.

In the cross-claim of Gilbert Lea against Craig C. Milne, Glenn M. Desmond and David Adams, d/b/a Emery Associates, judgment is entered in favor of Gilbert Lea and against Craig C. Milne, Glenn M. Desmond and David Adams, d/b/a Emery Associates, as contribution from said Associates, in such amount, but not exceeding $19,597.11, as Gilbert Lea may pay to The Emery Waterhouse Company on the above mentioned judgment of $78,388.43 against him over and above the sum of $58,791.32, together with interest and costs.

In the cross-claim of Craig C. Milne, Glenn M. Desmond and David Adams, d/b/a Emery Associates, judgment is entered in favor of Craig C. Milne, Glenn M. Desmond and David Adams, d/b/a Emery Associates, and against Gilbert Lea, as contribution from said Gilbert Lea, in such amount, but not exceeding $5,402.89, as the said Associates may pay to The Emery Waterhouse Company on the above mentioned judgment of $25,000.00 against them over and above the sum of $19,597.11, together with interest and costs.

As so modified, the judgments below are affirmed.

All concurring.