**PARIS UTILITY DISTRICT,**
Plaintiff, Appellee,

v.

**A.C. LAWRENCE LEATHER CO., INC.,**
Defendant, Appellant.

No. 88–1287.

United States Court of Appeals,
First Circuit.

Heard Sept. 13, 1988.

Decided Nov. 3, 1988.

As Amended Nov. 15, 1988.

Peter L. Murray with whom Michael L. Parker and Murray, Plumb & Murray, Portland, Me., were on brief, for defendant, appellant.

Theodore H. Kurtz with whom Douglas M. Myers and Kurtz & Myers, South Paris, Me., were on brief, for plaintiff, appellee.

Before COFFIN, BOWNES and BREYER, Circuit Judges.

BOWNES, Circuit Judge.

This contract diversity action when tried in the district court involved a number of factual and legal issues. The district court wrote a comprehensive and trenchant opinion. *Paris Utility District v. A.C. Lawrence Leather Co.*, 665 F.Supp. 944 (D.Me. 1987). The appeal, however, presents only one issue: the effect to be given an indemnity agreement entered into between plaintiff-appellee Paris Utility District and defendant-appellant A.C. Lawrence Leather Co.

I. The basic facts, which are taken from the district court opinion, are not in dispute. Paris Utility District is a quasi municipal entity that provides water and sewer services in South Paris, Maine. A.C. Lawrence Co. ran a tannery in South Paris. In 1976, the District and Lawrence's predecessor Estech, Inc., executed a contract whereby the District would construct a sewage treatment plant and treat the industrial wastes from Lawrence's tannery as well as other sewage. The parties have stipulated that the 1976 agreement is binding on Lawrence and the District. Under paragraph 21 of the contract, Lawrence agreed that the District could use, without cost, a specified portion of Lawrence's premises for depositing sludge produced by the sewage treatment plant. The balance of paragraph 21, which contains the indemnity agreement that is the focus of this appeal, provides:

In consideration of this permit, the District shall conduct on such premises a sanitary land-fill operation in accordance with all applicable Federal, State and local statutes, ordinances and regulations, *and, further, the District shall indemnify, save and hold the Company harmless from and against any and all liabilities and claims arising out of the activities conducted by the District on such premises.* (Emphasis added.)

The District used the designated portion of the premises (known as the landfill) for depositing sludge.

We now quote directly the pertinent findings of the district court.

As contemplated by the 1976 Agreement, the District deposited sludge in the landfill on Lawrence's premises. (Lawrence itself had been depositing waste at the site since 1955.) In 1973 the District had applied to Maine's Board of Environmental Protection (BEP) for permission to operate a landfill at the Lawrence site. The BEP denied the application because the soil on the site was too permeable to be suitable for sludge disposal; Lawrence knew of the BEP denial as early as 1975. The BEP ordered the District to find another site, but in the interim granted the District a series of temporary, conditional permits to operate the landfill. The last of these permits expired on October 1, 1979, and the District's application for a further extension was denied.

The BEP ordered the District to submit a site closure plan and a ground water quality monitoring plan by December 12, 1979. Despite an exchange of letters between the District and BEP over the following years, the District never submitted a site closure plan and did not submit the monitoring plan until 1985, when it did so in conjunction with Lawrence. Lawrence received copies of several of the District–BEP letters during this period and thus was repeatedly reminded that BEP had found the site unsuitable for permanent use and that the District was not operating the site in accordance with applicable law. Much of the sludge that the District deposited at the site was the by-product of the District's treatment of wastes from Lawrence's own operations, and Paul Finnegan, Lawrence's Director of Environmental Affairs, told the District that finding an appropriate landfill site elsewhere would have been very expensive for Lawrence.

665 F.Supp. at 946–47.

Since at least March of 1985, Lawrence has retained an engineering firm to monitor ground water contamination at the landfill used by the District on Lawrence's premises. Lawrence did so in order to comply with BEP requirements. As of October 1986, Lawrence had been billed more than $60,000 for these monitoring services.

*Id.* at 949.

■ II. The question is whether Lawrence can recover from the District under the indemnity provision of the 1976 contract the $60,000 it has been billed for the monitoring services. We agree with the district court that it cannot.

The controlling law on the scope and effect to be given indemnity agreements of the type at issue here is set forth in *Emery Waterhouse Company v. Lea,* 467 A.2d 986 (Me.1983):

Indemnity clauses to save a party harmless from damages due to negligence may lawfully be inserted in contracts such as the lease entered into between Emery Associates and Emery Waterhouse, and such clauses are not against public policy.

But, when purportedly requiring indemnification of a party for damage or injury caused by that party's own negligence, such contractual provisions, with virtual unanimity, are looked upon with disfavor by the courts, and are construed strictly against extending the indemnification to include recovery by the indemnitee for his own negligence. It is only where the contract on its face by its very terms clearly and unequivocally reflects a mutual intention on the part of the parties to provide indemnity for loss caused by negligence of the party to be

indemnified that liability for such damages will be fastened on the indemnitor, and words of general import will not be read as expressing such an intent and establishing by inference such liability. *Id.* at 993 (citations omitted).

It seems clear that, as the district court held, the indemnity agreement here did not meet the *Emery Waterhouse* requirements. The agreement provides: "The District shall indemnify, save and hold the Company harmless from and against any and all liabilities and claims arising out of the activities conducted by the District on such premises." The contract "on its face and by its very terms" does not "clearly and unequivocally reflect a mutual intention on the part of the parties to provide indemnity for loss caused" by the negligence of Lawrence, the party to be indemnified.

Lawrence seeks to avoid the strictures of the Maine rule on the ground that it is the intent of the parties that controls, and that such intent must be gleaned from all the circumstances at the time the indemnity contract was executed. Lawrence then goes on to argue that despite any knowledge or negligence on the part of Lawrence, the District intended to assume all of the risks attendant upon use of the landfill for depositing sludge. This, Lawrence says, is clear because the District knew that Lawrence and its predecessor, Estech, had been using the landfill area as a dumpsite for its own sludge since 1955.

Lawrence cites as authority for its argument *Whit Shaw Associates v. Wardwell,* 494 A.2d 1385 (Me.1985). The question in that case was the effect to be given an indemnity clause that was part of a brokerage agreement for the sale of a bakery business. The clause provided that the Broker agreed to prepare for the Owner a brochure describing the business, with the Owner having the right to review, make corrections, and give his written approval for the final version of the brochure. The sentence in dispute read: "Owner shall indemnify and hold harmless the Broker for any loss, injury or damage suffered by Broker by reason of any claim arising out of or by reason of an error, misleading statement or misrepresentation contained in said brochure." *Id.* at 1386. The Supreme Judicial Court of Maine found that "the definition of 'Owner' for purposes of identifying who undertook to indemnify *Whit Shaw* is ambiguous." *Id.* It held that "[w]ho the owner is cannot be determined without extrinsic evidence." *Id.* The case was remanded to resolve the ambiguity. In the course of its opinion, the court stated the well-known rule: "[T]he paramount principle in the construction of contracts is to give effect to the intention of the parties as gathered from the language of the agreement viewed in the light of all the circumstances under which it was made." *Id.* at 1387. This case does not, as Lawrence urges, modify the *Emery Waterhouse* rule as to indemnity agreements so as to make the intent of the parties the *sine qua non.* Nowhere does *Whit Shaw* mention *Emery Waterhouse,* decided two years prior, either directly or indirectly. It merely restates the universally accepted contract principle that where a contract, or a part thereof, is ambiguous, extrinsic evidence may be used to determine the intent of the parties. There is nothing ambiguous about the indemnity agreement in the case before us. The District is obligated to indemnify Lawrence for any and all claims "arising out of the activities conducted by the District" on Lawrence's premises. *Whit Shaw* is no bar to the application of *Emery Waterhouse* and the intent of the parties is not a factor to be considered.

Lawrence also tries to avoid the impact of *Emery Waterhouse* on the grounds that its facts differentiate it from the case at bar and therefore it does not apply. We need not rebut point by point Lawrence's rather intricate argument. *Emery Waterhouse* laid down a general rule as to indemnity agreements. Unless the rule is narrowed by the Supreme Judicial Court of Maine, we are bound under the *Erie* doctrine to follow it. We have found no Maine case, and Lawrence has cited none, limiting the scope of *Emery Waterhouse.*

The next contention made by Lawrence is that its conduct was neither tor-

tious, nor "active" negligence and that therefore *Emery Waterhouse* does not apply. The district court made the following findings on the issue of whether Lawrence was negligent and whether such negligence made the ground water monitoring necessary.

The Court has no difficulty in concluding that Lawrence's conduct in this respect was, at the least, negligent. Lawrence was aware at least as early as 1975 that its site was unsuitable for permanent use as a landfill because the permeability of the soil made the landfill a threat to the ground water. And Lawrence was repeatedly reminded of this fact, and of the need to close the landfill, from the time the 1976 Agreement was signed up until the present. It appears that Lawrence learned as early as 1977 that the BEP required ground water monitoring at the site. Lawrence knew that after October 1, 1979 the use of the landfill violated applicable law, yet it took no steps to stop the District's use of the landfill, as Paragraph 21 gave it the right to do in such a situation. Nor did Lawrence otherwise attempt to reduce the threat of ground water contamination. Lawrence continued to operate the tannery throughout this period, generating a large proportion of the waste that the District deposited at the landfill. The Court makes no determination of what Lawrence knew or should have known about the harm that contaminated ground water from its site had caused or might cause. The Court determines only that Lawrence failed to exercise ordinary care to minimize the threat of ground water contamination and that Lawrence thereby caused the ground water monitoring to become necessary.

*Id.* at 960–61 (footnote omitted).

Findings of fact cannot be set aside unless they are clearly erroneous. Fed.R.Civ. P. 52(a). *See Anderson v. Bessemer City,* 470 U.S. 564, 573–76, 105 S.Ct. 1504, 1511–13, 84 L.Ed.2d 518 (1985). Based upon the record, we cannot find that the district court's finding of negligence by Lawrence was clearly erroneous.

Lawrence's last argument requiring discussion is that its negligence was "passive" and therefore falls outside the ambit of *Emery Waterhouse.* Its legal basis for the claim is language taken from *Northeast Bank of Lewiston and Auburn v. Murphy,* 512 A.2d 344 (Me.1986). We point out first that *Northeast Bank* did not involve an indemnity agreement. The question was whether an insurer which paid the settlement proceeds of a personal injury action to the debtor's attorney in contravention of the judgment creditor's lien on settlement proceeds was entitled to indemnity from the attorney in the judgment creditor's conversion action against the insurer. The court found that the insurer had contacted the attorney on learning of the lien and did all it could to assure that the lien would be paid and tried to persuade the attorney to set aside funds to satisfy the lien. In finding that the attorney should indemnify the insurer the court stated:

> The case at bar is an appropriate one for indemnity in order 'to do justice within the law so that one guilty of an active or affirmative act of negligence [or intentional act] will not escape liability, while another whose fault was only technical or passive assumes complete liability.' 41 Am.Jur.2d Indemnity § 20, at 706 (1968).

*Id.* at 351. As in *Whit Shaw Associates v. Wardwell,* 494 A.2d 1385, there is no mention directly or by plausible inference of *Emery Waterhouse.* We do not think that this statement can be the basis for carving a "passive" negligence exception out of *Emery Waterhouse.* We add that we are dubious that Lawrence's conduct and failure to act can correctly be characterized as "passive" negligence.

We have considered all other contentions made by Lawrence and find them unavailing. The rule of *Emery Waterhouse* controls.

AFFIRMED.

Costs to appellee.