**PARIS UTILITY DISTRICT, Plaintiff,**

v.

**A.C. LAWRENCE LEATHER CO., INC., Defendant.**

**Civ. Nos. 86–0111 P, 86–0234 P.**

United States District Court, D. Maine.

July 15, 1987.

Theodore H. Kurtz, Kurtz & Myers, South Paris, Me., Stephen P. Beale, Skelton, Taintor, Abbott & Orestis, Auburn, Me., for plaintiff.

Peter L. Murray, Michael L. Parker, Murray, Plumb & Murray, Portland, Me., Nancy S. Bryson, Richard E. Schwartz, Crowell & Moring, Washington, D.C., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

GENE CARTER, District Judge.

These consolidated diversity cases grow out of a contractual arrangement whereby Plaintiff Paris Utility District ("the District") treated the industrial wastes generated by Defendant A.C. Lawrence Leather Co., Inc. ("Lawrence") at its tannery plant in South Paris, Maine. The District seeks to recover from Lawrence (1) a portion of the costs of expanding the laboratory at its treatment facility and (2) certain waste

treatment costs incurred by the District in 1986, after Lawrence had ceased discharging waste to the District's facility. Lawrence seeks a declaration that it is entitled to contractual indemnification from the District for all costs incurred or to be incurred as a result of the District's activities at a landfill on Lawrence's property. Lawrence also alleges that the District has overcharged for its waste treatment services; Lawrence seeks an accounting to determine its entitlement to a reimbursement. After a three-day bench trial, the Court now enters its findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

## I. *Findings of Fact*

Plaintiff Paris Utility District is a quasi-municipal entity providing water and sewer services in South Paris, Maine. Defendant A.C. Lawrence Leather Co., Inc. is incorporated in and maintains its principal place of business in Massachusetts. In 1976 the District and Lawrence's predecessor, Estech, Inc., entered an agreement ("the 1976 Agreement") under which the District would construct a treatment facility and thereafter treat the industrial wastes from Lawrence's tannery in South Paris. The parties stipulate that the 1976 Agreement is binding on Lawrence and the District.

Under Paragraph 5 of the 1976 Agreement, the District agreed to seek partial state and federal funding for the costs of constructing the facility, and Lawrence agreed to contribute its fair share of the local costs of construction, *i.e.*, those costs not covered by state or federal funding and thus borne by the facility's users. Paragraph 9 of the 1976 Agreement required Lawrence to pay "its proportional share of the operation and maintenance costs to the District of its Water Pollution Control Facility, computed in accordance with the formula set forth on pages 11–A, 12–A and 13–A" of a 1975 Report prepared by the Whitman & Howard engineering firm (hereinafter "the Whitman & Howard Report"). Under Paragraph 13 of the 1976 Agreement, "[s]hould [Lawrence] cease operation after the Treatment Facility is constructed, [Lawrence] shall pay its assessment for the operation and maintenance expense for the full quarter year in which discharge of the [Lawrence] waste to the Treatment Facility last occurred and shall not again be assessed so long as there continues to be no waste discharged to the Treatment Facility." Under Paragraph 21 of the 1976 Agreement, Lawrence agreed to "permit the District to use without cost to the District, [Lawrence's] premises ... for the deposit thereon of waste sludge generated by the Treatment Facility.... In consideration of this permit, the District shall conduct on such premises a sanitary landfill operation in accordance with all applicable Federal, State and local statutes, ordinances and regulations, and, further, the District shall indemnify, save and hold [Lawrence] harmless from and against any and all liabilities and claims arising out of the activities conducted by the District on such premises."

The facility was constructed as planned and Lawrence contributed 64.64 percent of the local costs of construction. Lawrence began discharging to the plant and paid bills, as rendered by the District, on a monthly basis for its share of the facility's operation and maintenance costs. Lawrence also paid bills for certain capital improvements to the facility that were unrelated to the original construction; these bills were for varying percentages of the total cost of the improvements (from 84.2 percent to 100 percent), apparently depending upon the extent to which each improvement benefited Lawrence as compared with the District's other customers.

As contemplated by the 1976 Agreement, the District deposited sludge in the landfill on Lawrence's premises. (Lawrence itself had been depositing waste at the site since 1955.) In 1973 the District had applied to Maine's Board of Environmental Protection (BEP) for permission to operate a landfill at the Lawrence site. The BEP denied the application because the soil on the site was too permeable to be suitable for sludge disposal; Lawrence knew of the BEP denial as early as 1975. The BEP ordered the District to find another site, but in the interim granted the District a series of temporary, conditional permits to operate

the landfill. The last of these permits expired on October 1, 1979, and the District's application for a further extension was denied.

The BEP ordered the District to submit a site closure plan and a ground water quality monitoring plan by December 12, 1979. Despite an exchange of letters between the District and BEP over the following years, the District never submitted a site closure plan and did not submit the monitoring plan until 1985, when it did so in conjunction with Lawrence. Lawrence received copies of several of the District-BEP letters during this period and thus was repeatedly reminded that BEP had found the site unsuitable for permanent use and that the District was not operating the site in accordance with applicable law. Much of the sludge that the District deposited at the site was the by-product of the District's treatment of wastes from Lawrence's own operations, and Paul Finnegan, Lawrence's Director of Environmental Affairs, told the District that finding an appropriate landfill site elsewhere would have been very expensive for Lawrence.

In 1984 the District received a letter from the United States Environmental Protection Agency (EPA) indicating that the District was discharging insufficiently-treated effluent into the Little Androscoggin River and that unless the District and Maine's BEP could resolve the matter themselves, EPA was prepared to take action to force the District into compliance. Subsequently, in September of 1984, the District and Maine's BEP negotiated an administrative consent agreement and order requiring the District to improve its operations. At the suggestion of Richard Micklon, the District's chief operator, this agreement incorporated a requirement that the District expand its laboratory facilities to permit improved process control and effluent quality testing.

In December of 1984, the District wrote to Robert Abate, Lawrence's Vice President of Finances, stating that "[a]s you are

aware, A.C. Lawrence has a contractual obligation to pay it's [sic] fair share of the costs involved with capital improvements" and asking for Abate's "thoughts on a mutually agreeable repayment plan" for Lawrence's share of the lab expansion costs, which at that time were estimated to total $150,000. In an internal Lawrence memo dated December 7, 1984, Finnegan stated:

A negotiated agreement with the [District] would be more favorable to [Lawrence] if it could be arranged. Otherwise we may end up paying more than we have to, since we pay ninety percent of the operating costs. If the [District] would accept the same percentage contribution toward the laboratory as it did in the original construction costs of the plant, it would be to [Lawrence's] advantage. This would amount to about twenty-five percent. However, this is a big "if."

On January 7, 1985, the District's trustees met with Abate and Finnegan, who proposed a twenty-six percent figure. A week later, the trustees made a counterproposal that Lawrence pay 64.64 percent of the lab expansion costs. The trustees explained that although Lawrence had paid about twenty-seven percent of the *total* costs of the original facility, much of that total cost had been covered by state and federal grants; the appropriate figure representing Lawrence's share of the use of the facility was 64.64 percent, *i.e.*, Lawrence's share of the local, user-borne costs.

On May 7, 1985, the District awarded a $133,753 contract to construct the lab expansion. Shortly thereafter, Lawrence announced that it was closing the "beamhouse" portion of its tanning operation in South Paris.[1] Finnegan then requested a meeting with the District and Maine's Department of Environmental Protection (DEP) to discuss whether the lab expansion was still needed in view of Lawrence's scaled-back operation. The parties met first on May 24, and the District informed Lawrence that the lab expansion contract

---

**1.** Lawrence's operation was divided into two parts—the beamhouse and the tanhouse—and the closing of the beamhouse was expected to

reduce the volume and change the composition of Lawrence's discharge to the District's facility.

had already been awarded. The parties met again on May 31, at which time the District's consulting engineer stated that the lab expansion was still necessary and the DEP representative stated that the lab expansion would have to remain a part of the consent agreement.

Representatives of the District and Lawrence met again on June 7, 1985. The parties agreed on a 64.64 percent share, but Abate stated that Lawrence could not pay its share all at once. The possibility was raised that Lawrence could pay its share without interest; the parties left the meeting agreeing to consider this proposal.[2] In a June 20 internal memo, Finnegan stated that he and Abate had met with the District and worked out "a satisfactory [Lawrence] share" of the lab expansion costs. On June 24 the District's trustees met and voted to propose that Lawrence pay sixty-five percent at seven percent interest, with monthly payments of at least $2,000. On June 28, Dan Morse, the District's Superintendent, communicated this proposal to Abate, who objected to the interest rate and proposed that no interest be charged.

On July 8, Abate left a telephone message for Morse proposing payments at six percent interest over six years. Abate knew that the District's trustees were meeting that evening and wanted Morse to communicate the Lawrence proposal at that time. The District's trustees met that evening and voted to accept Abate's latest proposal, with payments to begin August 15, 1985. The trustees instructed Morse to communicate the acceptance to Abate and to have the District's attorneys draw up a promissory note. On July 9, Morse attempted to reach Abate but could only reach Finnegan; Morse told Finnegan of the trustees' vote and indicated that the

District would send Lawrence a promissory note for Lawrence to sign. Finnegan indicated a "preference" that payments begin on September 1 instead of August 15, but otherwise voiced no disagreement with the results of the trustees' vote. Finnegan then wrote Abate a memo, telling him of the District's acceptance.[3] The Court infers that at this point the parties intended to be bound by their agreement as it then stood; they viewed the signing of the promissory note merely as a formality.[4]

The District's attorneys then drew up a promissory note under which Lawrence would agree to pay $86,457.94 (i.e., 64.64 percent of the $133,753 contract price of the lab expansion) plus six percent interest in monthly installments over six years, with payments to begin on August 15, 1985. The draft note also included, inter alia, this language:

> Any additional charges due by Lawrence to the District over and above the contract price for the laboratory expansion shall be computed by the District at the end of construction and Lawrence's share of said additional charges shall be added to the principal balance due on this Note. The calculation and determination of any additional charges due by Lawrence hereunder shall be made exclusively by the District whose calculations in that respect shall be final and conclusive.

The District forwarded the note to Lawrence, but Lawrence returned it unsigned sometime before August 12, 1985, requesting a change in terms and a meeting with the District to discuss stopping the lab expansion altogether.

On August 28, the District's trustees met with Abate and Finnegan and asked how Lawrence intended to pay its share of the lab expansion costs. Abate responded that Lawrence would pay a portion of the costs

---

2. At trial the parties hotly contested the question whether Lawrence or the District had proposed the no-interest term. The Court fails to see how the dispute is material to any issue in the case and therefore makes no finding on the question.

3. Finnegan's memo to Abate read as follows:

7/9/85

Bob

Dan Morse called to say that the board of trustees voted OK on your 6% for 6 years proposal. Their attorney will draw up an agreement which will be effective either August 15 or September 1. They know we would prefer September 1.

Paul

4. The basis for and significance of this finding as discussed further in section II. A. 2.b., infra.

each month for as long as Lawrence continued to operate in South Paris; the District stated that this was unacceptable. Abate also asked if it would be possible to reduce the cost of the lab expansion, but the District's consulting engineer responded that the work had progressed too far to permit such a reduction. (As of the time of trial, the work had in fact been completed.)

Since October of 1984 the District had sent Lawrence six bills, each for 64.64 percent of a particular District expenditure on the lab expansion project. Lawrence had paid four of these bills, most recently on July 29, 1985, totaling $3,165.41. From August of 1985 on, the District continued to send these bills, but Lawrence did not pay them. On November 22, 1985, Abate wrote to the District about these bills, declaring that the cost of the lab expansion was not among the capital costs that Lawrence was required to pay under the 1976 Agreement and that, although Lawrence had agreed to pay 64.64 percent of the lab expansion cost, no final agreement had ever been reached as to how Lawrence would pay this share. The letter concluded that the cost of the lab expansion should be amortized over its useful life and therefore that Lawrence should pay its proportionate share of that amortized cost only for so long as it continued to operate the South Paris plant and discharge waste to the treatment facility.

On December 24, 1985, Lawrence made its last waste discharge to the facility. At that point, a given discharge to the facility required eighteen days for full treatment, so that treatment of Lawrence's final discharge continued until January 10, 1986. In addition to sending Lawrence a normal bill for December, the District sent Lawrence a bill reflecting the cost of these ten days of treatment in January as well as Lawrence's share of the fixed operating and maintenance costs of the facility in January. Later, the District sent bills for Lawrence's share of the February and March operating and maintenance costs, even though Lawrence had discharged no waste to the facility since December. The total of these bills for January, February,

and March was $19,750.69. Lawrence never paid these bills.

Since at least March of 1985, Lawrence has retained an engineering firm to monitor ground water contamination at the landfill used by the District on Lawrence's premises. Lawrence did so in order to comply with BEP requirements. As of October 1986, Lawrence had been billed more than $60,000 for these monitoring services.

## II. *Conclusions of Law*

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1332(a)(1), 1441, 1446. It is undisputed that Maine law applies to each of the claims asserted herein.

### A. *The District's Claim for Laboratory Expansion Costs*

The District advances two theories to support its claim that it is entitled to recover from Lawrence some portion of the lab expansion costs. These theories are based on the 1976 Agreement and on an alleged oral agreement reached on July 9, 1985. The Court addresses each of these theories in turn.

1. *The 1976 Agreement.* As noted above, Paragraph 9 of the 1976 Agreement required Lawrence to pay "its proportional share of the operation and maintenance costs [of the District's facility], computed in accordance with the formula set forth on pages 11–A, 12–A and 13–A" of the so-called Whitman & Howard Report. The District contends that the costs of designing and constructing the lab expansion are "operation and maintenance" costs and that it is thus entitled to recover these costs from Lawrence. To rebut the obvious counter argument that the lab expansion costs were capital costs rather than operation and maintenance costs, the District makes four points.

First, the District points to a footnote to the formula on page 12–A of the Whitman & Howard Report. The formula yields the annual cost to be paid to the District by a given industry, and includes "both a charge for fixed costs and a charge for operation and maintenance." The footnote indicates that the values to be assigned to three

variables—all of them having to do with the *fixed* costs of waste treatment—are "dependent on future year of entry to the system and may be a function of new capital costs should the waste load be significant." The District contends that this footnote, which as a part of page 12–A was incorporated by reference into the 1976 Agreement, indicates that new capital costs may be included in operation and maintenance costs.

This argument ignores the fact that, assuming *arguendo* that everything in the formula is relevant to computing operation and maintenance costs, the footnote by its terms applies only to future entrants to the system and/or to new capital costs made necessary by significant waste loads. It is undisputed that Lawrence was not a future entrant to the system and that the lab expansion costs were not made necessary by significant waste loads from Lawrence. There is no suggestion that Lawrence's discharges were ever of a different volume or composition than originally anticipated. The Court therefore concludes that the footnote does not establish that the lab expansion costs are operation and maintenance costs within the meaning of the 1976 Agreement.

Second, the District points to a statement on page 11–A of the Whitman & Howard Report, which indicates that charges for the treatment of industrial waste would be based on the "average cost pricing" system described in "Federal Guidelines—Equitable Recovery of Industrial Waste Treatment Costs in Municipal Systems," published by the United States Environmental Protection Agency in October of 1971. A section of these Federal Guidelines entitled "Allocable Costs" indicates that the costs of future improvements to waste treatment facilities are allocable to industry. The District argues that this indicates that the costs of future improvements such as the lab expansion are allocable to the industry *as operation and maintenance costs.*[5]

This argument ignores the fact that the section on Allocable Costs is clearly divided into two subsections: one on "Capital Costs" and the other on "Operation and Maintenance Costs." Clearly, then, the Federal Guidelines recognize that some costs allocable to industry under the average cost pricing system are capital costs and not operation and maintenance costs. Therefore, the mere mention in the Whitman & Howard Report of the Federal Guidelines' average cost pricing system does not establish that all costs of future capital improvements must be considered to be *operation and maintenance costs* or were so considered by the District and Lawrence under the 1976 Agreement. And even if the Federal Guidelines did define all costs of future capital improvements as operation and maintenance costs, the Court would conclude that the specific formula set forth in the Whitman & Howard Report, which formula does not mention future capital costs except in the footnote discussed above, would be controlling over the general contractual language incorporating by reference the Federal Guidelines.

Third, the District points to a section of the Whitman & Howard Report entitled "Total Annual Revenue Requirements,"

5. The District has asked the Court to take judicial notice of the contents of the Federal Guidelines, copies of which were furnished to the Court at trial. Essentially, the District asks the Court to take judicial notice of the fact that the Federal Guidelines referenced in the Whitman & Howard Report define allocable costs so as to include costs of future capital improvements. The District having furnished copies of the Federal guidelines indicating this to be the case, and Lawrence having submitted nothing at or after trial to question the accuracy of the copies, the Court concludes that judicial notice of the fact just mentioned is appropriate under Fed.R. Evid. 201(b)(2). The Court also takes notice of the fact that the section entitled "Allocable Costs" is divided into two subsections, one on "Capital Costs" and the other on "Operation and Maintenance Costs." It is evident that the District's request that the Court take judicial notice was an attempt to avoid the need to authenticate the copies of the Federal Guidelines submitted at trial. Although proper authentication would have been preferable, the Court sees no prejudice to Lawrence from taking judicial notice under the circumstances of this case. *Cf.* 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2410 at 356–57 (1971) (stating that courts must take judicial notice of contents of *Federal Register* and may take notice of other federal records).

which states that "[t]he annual revenue requirements of the District's water pollution control facilities may be divided into two major categories ... (1) Operation and Maintenance .... (2) Fixed Charges on Debt Service (on the facilities being constructed with the waste water treatment grant)." The District argues that every cost incurred by the District must fall into one of these two categories. Because the lab expansion costs clearly cannot be placed in the latter category, the District concludes, they must belong in the former.

The fallacies in this argument are obvious. First, the argument requires the assumption that the Whitman & Howard Report correctly anticipated all of the different types of costs to be incurred by the District in the future. It ignores the scenario now presented by this case: that the District might incur future costs that the Whitman & Howard Report failed to foresee, *i.e.*, capital costs that would not be categorizable either as operation and maintenance costs or as fixed charges on the debt service covering the construction of the original facility. Second, assuming *arguendo* that all costs must fall into one or the other category, the argument reaches the desired result only by adopting the premise that the lab expansion costs could not possibly be categorized as a fixed charge on debt service. If this premise were true, there would be no difficulty in concluding that the lab expansion costs must be operation and maintenance costs. But an equally plausible premise is that the lab expansion costs could not possibly be categorized as an operation and maintenance cost and therefore must be a fixed charge on debt service.

Fourth, the District points to Lawrence's own conduct as evincing an understanding that it could be billed for the District's new capital expenditures as a part of its monthly operation and maintenance bills. In making this argument, the District notes that on four previous occasions Lawrence had paid for new capital expenditures.

However, the District has not cited any record evidence, nor can the Court find any, indicating that these new capital expenditures were billed to Lawrence as a part of Lawrence's monthly operation and maintenance bills, or that Lawrence considered the new capital expenditures to be operation and maintenance costs when it paid for them. The bills for those new capital expenditures themselves are not in evidence, nor can the Court find anything in the monthly operation and maintenance bills that reflects those expenditures. The District therefore has not borne its burden of proving that Lawrence treated those new capital expenditures as operation and maintenance costs.

In a further attempt to show that Lawrence itself treated the District's new capital expenditures as billable under the operation and maintenance rubric, the District relies on two statements by Lawrence personnel. The first is Finnegan's December 7, 1984 internal memo stating that a negotiated agreement to pay for lab expansion costs was desirable; "[o]therwise we may end up paying more than we have to, since we pay ninety percent of the operating costs." The second is Abate's November 22, 1985 letter to the District stating that the lab expansion cost should be amortized over the lab's useful life and that Lawrence should pay its proportionate share of that amortized cost for so long as it continued to operate in South Paris.

In the Court's view, these statements indicate, at most, Lawrence's position that it could be required to pay for the lab expansion costs *if* they were properly amortized over the life of the lab and *if* Lawrence was still operating in South Paris. The District's argument—that it could treat the lab expansion costs as ordinary operation and maintenance costs and bill Lawrence for Lawrence's full share of the costs each month when the costs were incurred—simply reads too much into Finnegan's and Abate's statements.[6]

---

6. The Court recognizes that Finnegan's statement comes closer than Abate's to suggesting that Lawrence might treat the lab expansion costs as operation and maintenance costs. The Court, however, gives greater weight to the statement of Abate, who was Vice President of Finances, than to that of Finnegan, who was Director of Environmental Affairs and thus less

The Court concludes that the lab expansion costs are not operation and maintenance costs within the meaning of Paragraph 9 of the 1976 Agreement. The District's claim based on that provision therefore fails.

2. *The Alleged Oral Agreement of July 9, 1985.* The District's second theory is that the parties reached an oral agreement for the payment of lab expansion costs in two steps. First, on June 7, 1985, the parties agreed that Lawrence's share would be 64.64 percent. Then, on July 9, 1985, Morse told Finnegan that the District's trustees had voted to accept Abate's six percent interest/six year proposal. Lawrence responds that this alleged oral agreement still lacked material terms, that the District's "acceptance" was in fact a counteroffer containing new terms and thus terminating the District's power of acceptance, and that in any case the statute of frauds renders the agreement unenforceable.[7]

■ a. *Omission of Material Terms.* First, Lawrence contends that the oral agreement lacked material terms governing (1) whether Lawrence's payment obligation was conditional on Lawrence's continuing operations in South Paris and (2) the maximum amount Lawrence could be required to pay for the lab expansion. Clearly, for there to be an agreement the parties must have manifested their mutual

assent to all of its material terms. *Ouellette v. Bolduc,* 440 A.2d 1042, 1045 (Me. 1982); *Sevigny v. Home Builders Ass'n of Maine, Inc.,* 429 A.2d 197, 202 (Me.1981). Put another way, a manifestation of intent is not an offer, and thus cannot be accepted so as to form a contract, unless the terms of the contract are reasonably certain, *i.e.,* they provide a basis for determining the existence of a breach and for giving an appropriate remedy. *Restatement (Second) of Contracts* § 33(1), (2) (1979); *see Ross v. Mancini,* 146 Me. 26, 27, 76 A.2d 540 (1950).

In the instant case, until August of 1985, neither Lawrence nor the District ever raised the issue of whether Lawrence's payment obligation would be conditional on its continuing operations in South Paris. The issue may have been important to Lawrence, but throughout the negotiations Lawrence never communicated this to the District, despite considerable discussion of whether the payment should be spread out over five, six, or seven years. Nor can it be said that the District reasonably should have known of the issue's importance to Lawrence.[8] Lawrence made a six percent interest/six year proposal on July 7, and Lawrence's failure to mention the continuing operations issue does not render Lawrence's proposal, taken together with the earlier agreement on 64.64 percent, too uncertain to constitute an offer. The fact that Lawrence subsequently realized and

---

knowledgeable about Lawrence's interpretation of the phrase "operation and maintenance costs."

**7.** Lawrence also argues that there was no enforceable oral agreement because the parties never agreed on all three terms—64.64 percent at six percent interest over six years—at the same time. The Court concludes, however, that the parties on June 7 had agreed to a 64.64 percent share and that, despite the District's mention of a 65 percent share on June 28, this agreement—although not enforceable standing alone—remained in effect at the time of Morse's July 9 conversation with Finnegan. The Court further notes that Lawrence has admitted in its posttrial brief that Abate, in his July 8 telephone call, suggested terms of 64.64 percent at six percent interest over six years.

**8.** The Court recognizes that under Paragraph 13 of the 1976 Agreement, Lawrence's obligation to pay its share of the District's *operation and*

maintenance costs was conditional upon Lawrence's continuing operations. But Paragraph 13 also required that, in the event of a shutdown, Lawrence would continue to make *capital* contributions until it had paid its entire share of the facility's original construction cost as required by Paragraph 5 of the 1976 Agreement. Because the negotiations indicated that Lawrence and the District were treating the lab expansion as a capital expenditure rather than an operation and maintenance cost, if anything the District had some reason to believe that any agreement for Lawrence to pay a share of the lab expansion costs would *not* be conditional upon Lawrence's continuing its operations in South Paris. The District could reasonably have interpreted Abate's proposal, which omitted any mention of conditioning payments on continuing operations, to be consistent with this understanding.

communicated the importance of the issue means only that Lawrence was careless during negotiations in respect to proposing terms sufficient to protect its own interests; it does not retroactively render those negotiations too vague to lead to an agreement.

■ The omission of a term stating in dollar terms the maximum amount Lawrence could be required to pay for the lab expansion is more troubling. At first glance, price would always appear to be a material term of any contract involving the payment of money; but it is well recognized that in some circumstances the omission of a price term does not render a proposal too indefinite to constitute an offer. *See Blue Rock Indus. v. Raymond Intern., Inc.,* 325 A.2d 66, 75–76 (Me.1974); Me.Rev.Stat.Ann. tit. 11, § 2–305 (1964); *Restatement (Second) of Contracts* § 204 (1979). Often courts supply a "reasonable" price term. That is unnecessary here, however, because the parties did set a limit on the amount Lawrence could be required to pay for the lab expansion. That limit was 64.64 percent of the costs to the District of constructing the lab expansion, plus six percent interest, payable over six years. The fact that the cost to the District could not be ascertained in exact dollar terms in advance does not render Lawrence's agreement to pay 64.64 percent of that cost too vague to be enforceable. Nor is the agreement rendered too vague by the possibility of later disputes over whether the cost was too great or over whether Lawrence was being billed for costs unrelated to the lab expansion. Had such a dispute arisen, the Court might have been called upon to determine whether the lab expansion costs billed to Lawrence were reasonable, but that hypothetical case is not before the Court.

The parties' prior relationship confirms that the omission of a maximum dollar term did not render the oral agreement too vague. The Court notes that Paragraph 5 of the 1976 Agreement, in obligating Law-

rence to pay its share of the original construction costs of the District's facility, stated: "It is agreed that the costs are [sic; as] presented in the [Whitman & Howard] Report are approximate[;] and final project costs with the resulting [Lawrence] contribution will be determined upon completion of construction." As presented in the Whitman & Howard Report, Lawrence's estimated share of the original construction costs of the facility was $1,457,902.90. As finally determined by Whitman & Howard in 1981, Lawrence's actual share of the original construction costs of the facility was apparently $1,486,113.59.[9] There is no evidence that Lawrence viewed the 1976 Agreement as unenforceably vague because of its omission of a maximum dollar term, or that Lawrence had ever expressed any reservations about the procedure of agreeing to pay its share of original construction costs before such costs could be ascertained exactly. Nor is there evidence that Lawrence communicated to the District any displeasure over the $28,210.69 disparity between the estimated and actual original construction costs. In short, the parties' prior relationship gave the District no reason to believe that Lawrence viewed a maximum dollar term as essential or "material" to an agreement to pay its share of the lab expansion cost.

Similarly, the parties' negotiations over Lawrence's share of the lab expansion costs confirm that the omission of a maximum dollar term did not render the agreement too vague. In December of 1984, the District informed Lawrence that the estimated cost of the lab expansion was $150,000. Although at various points in the negotiations Lawrence asked in general terms whether this cost could be reduced, the negotiations always focused on Lawrence's percentage share, interest rate, and time for payment. Negotiations simply never focused on actual maximum dollar amounts, and Lawrence never requested that such a term be part of the parties' agreement. Indeed, Lawrence was informed on May 24 that the lab expansion

9. The record is not entirely clear as to Lawrence's actual final share of the original construction costs. If anything, the record suggests

that the figure was higher than that given in the text, which would only strengthen the Court's conclusion on this issue.

contract had been awarded, but there is no evidence that Lawrence even asked to know the contract price; and in a June 20 internal memo, Finnegan reported that he and Abate had met with the District and worked out "a satisfactory [Lawrence] share," again without so much as mentioning an actual dollar amount or a maximum dollar term. Therefore, in the absence of any indication or reason to believe that Lawrence wanted a maximum dollar term, Lawrence's agreement to pay 64.64 percent of the lab expansion cost is not so vague as to be unenforceable.

■ b. *The Subsequent, Unexecuted Promissory Note.* Next, Lawrence argues that the promissory note forwarded by the District to Lawrence was not an acceptance of any offer made by Lawrence but instead a counteroffer incorporating new terms and thus terminating the District's power to accept Lawrence's offer. *See Restatement (Second) of Contracts* § 39(2) (1979). Specifically, Lawrence points to the incorporation in the promissory note of the term, quoted in full *supra*, regarding additional lab expansion charges over and above the contract price.[10]

Lawrence's characterization of the promissory note as a counteroffer rather than an acceptance assumes that the note must have been one or the other. What Lawrence ignores is that the District had already accepted Lawrence's six percent interest/six year offer on July 9; it is this agreement, together with the June 7 agreement on 64.64 percent, that constitutes the oral agreement upon which the District sues. The promissory note, drafted by the District's attorneys after this oral agreement was reached, is properly analyzed neither as a counteroffer nor an acceptance, but rather as a written memorial of the oral agreement. The question to be resolved, therefore, is not whether the note varied impermissibly the terms of the oral

agreement—after all, the note was never signed and, standing alone, is thus without legal effect—but, rather, whether the oral agreement was itself intended to be effective or instead was merely intended as a preliminary to the execution of a note.

The governing principle is well established in Maine law:

[T]he question is mainly one of intention. If the party sought to be charged intended to close a contract prior to the formal signing of a written draft, or if he signified such an intention to the other party, he will be bound by the contract actually made, though the signing of the written draft be omitted. If on the other hand, such party neither had nor signified such an intention to close the contract until it was fully expressed in a written instrument and attested by signatures, then he will not be bound until the signatures are affixed. The expression of the idea may be attempted in other words: if the written draft is viewed by the parties merely as a convenient memorial, or record of their previous contract, its absence does not affect the binding force of the contract; if, however, it is viewed as the [c]onsummation of the negotiation, there is no contract until the written draft is finally signed.

*Mississippi & D. Steamship Co. v. Swift,* 86 Me. 248, 258–59, 29 A. 1063 (1894); *see Akerley v. Lammi,* 217 A.2d 396, 398–99 (Me.1966); *M.N. Landau Stores, Inc. v. Daigle,* 157 Me. 253, 258–59, 170 A.2d 673 (1961); *Clements v. Murphy,* 125 Me. 105, 107, 131 A. 136 (1925); *Berman v. Rosenberg,* 115 Me. 19, 25, 97 A. 6 (1916).

The Restatement expresses the same principle as follows:

§ 27. Existence of Contract Where Written Memorial is Contemplated.

Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so oper-

---

**10.** Because the agreement provided for Lawrence to pay 64.64 percent of the lab expansion costs, and because neither party had ever mentioned limiting Lawrence's liability to the contract price, the Court concludes that the first sentence of this term, permitting lab expansion charges over and above the contract price to be added to the principal balance due on the note, does not add anything to the terms already agreed upon. The second sentence, however, giving the District "final and conclusive" authority to calculate these additional charges, does add to the terms agreed upon.

ating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations. *Restatement (Second) of Contracts* § 27 (1979). The Court recognizes that the *Mississippi & D. Steamship Co.* case, decided in 1894, found both a party's subjective, unexpressed intent and that party's objectively manifested intent to be relevant in determining whether the party intended to be bound by the oral agreement. The Restatement, in contrast, makes plain that only the party's objectively manifested intent is relevant. The Court believes that the Maine Law Court, if confronted with the question today, would adopt the more modern, objective approach embodied in the Restatement.

In *Mississippi & D. Steamship Co.*, the Law Court stated that in determining whether the parties intended to be bound by their oral agreement or only by a signed writing,

> several circumstances may be helpful, as: whether the contract is of that class which are usually found to be in writing; whether it is of such nature as to need a formal writing for its full expression; whether it has few or many details; whether the amount involved is large or small; whether it is a common or unusual contract; whether the negotiations themselves indicate that a written draft is contemplated as the final conclusion of the negotiations. If a written draft is proposed, suggested or referred to, during the negotiations, it is some evidence that the parties intended it to be the final closing of the contract.

Still, with the aid of all rules and suggestions, the solution of the question is often difficult, doubtful and sometimes unsatisfactory.

86 Me. at 259, 29 A. 1063; *see Restatement (Second) of Contracts* § 27, comment c (1979).

As noted above in the Findings of Fact, the Court is satisfied that the District has met its burden of showing that on July 9 the parties did intend to be bound by their oral agreement as it then stood. They viewed the signing of the promissory note as merely a formality. A number of facts support this finding.

First, Lawrence had apparently paid for capital improvements on four past occasions without first having reached a written agreement; at least, there is no evidence that written agreements were reached. The amounts involved on those four occasions were $30,444.73; $25,113.36; $29,573.00; and $13,699.00. Thus, Lawrence apparently was willing to do business with the District, and to pay substantial amounts of money for capital improvements based on oral agreements.[11]

Second, the negotiations over Lawrence's payment for the lab expansion had been for the most part conducted orally, rather than through the exchange of a series of draft agreements. Had the parties proceeded in this latter fashion, refining the exact written language until one party's draft was acceptable to the other, the Court's finding might be different. But where all the negotiations were oral and focused on only three simple terms (share, interest rate, and payment period) rather than on detailed contractual language, the Court can only conclude that as of July 9 neither party attached any importance to the "fine print."

Third, as of July 9 neither party gave any indication that there were further, "fine print"-type terms that still needed to be resolved and that the best way to do so

11. For example, the $29,573 expenditure represented the cost of a "beamhouse screen." Arrangements for Lawrence to reimburse the District for the expenditure were apparently made orally through John Barlow, a Lawrence employee who also sat on the District's board of trustees. The only written evidence of the arrangement is contained in an October 27, 1983 internal Lawrence memo, in which Finnegan stated: "John Barlow will ask the trustees if the screen can be billed to the District. When the bill arrives it will be given to [Lawrence] for payment. In this way the [District] owns it but we will be able to capitalize it and take the depreciation without any liability." The actual final cost of purchasing and installing the screen was not specified, nor was it known in advance.

was by exchanging written drafts.[12] On the contrary, the only open question—the only matter raised but not resolved—was when payments would begin, and Lawrence was content to express its "preference" for a September 1 date but to leave the final decision to the District.

Fourth, Lawrence did not originate the idea of a written agreement or express any particular interest in one. Nor did Lawrence otherwise indicate that the oral agreement was merely a preliminary or that nothing was final until Lawrence had signed on the dotted line.

Fifth, the Court notes that in general the relations between the parties were cordial and, as of July 9, were expected to continue into the indefinite future. In short, the parties had a sufficiently trusting relationship such that both could expect an oral agreement to be binding, even if they also wanted it memorialized in writing. Therefore, Lawrence's later refusal to sign the promissory note does not render the oral agreement unenforceable.

■ c. *The Statute of Frauds.* Third, Lawrence argues that the statute of frauds renders the oral agreement unenforceable. In Maine,

> [n]o action shall be maintained ... [u]pon any agreement that is not to be performed within one year from the making thereof ... unless the promise, contract or agreement on which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith, or by some person thereunto lawfully authorized....

Me.Rev.Stat.Ann. tit. 33, § 51(5) (1964). Lawrence asserts that the oral agreement, which explicitly provided for payments over a six-year period, was within the statute of frauds and therefore unenforceable.

Although the agreement is within the statute of frauds, the Court nevertheless finds it enforceable for a number of reasons. First, two documents signed by Lawrence personnel, taken together, clearly establish the existence of an oral agreement on all terms considered material as of July 9. These documents are (1) Finnegan's July 9 memo to Abate, quoted in full in note 3, *supra,* stating that "the board of trustees voted OK on your 6% for 6 years proposal," and (2) Abate's November 22, 1985 letter to the District stating that Lawrence had "agreed to pay 64.64 percent of the cost of expansion." The fact that the agreement is shown on two documents instead of one is of no consequence. *See Restatement (Second) of Contracts* § 132 (1979). Nor does it matter that Finnegan's memo to Abate was not made as a memorandum of the oral agreement, *id.* section 133, or delivered to the District, *id.* comment b; or intended to bind Lawrence. *See Knobel & Bloom v. Cortell-Markson Co.,* 122 Me. 511, 513, 120 A. 721 (1923).

The oral agreement is also enforceable, despite being within the statute of frauds, because Lawrence has admitted all the facts essential to the Court's conclusion that there was an oral agreement. Specifically, Finnegan testified that the parties agreed on June 7 that 64.64 percent was an acceptable share and that a no-interest proposal was under consideration; Finnegan also testified that on July 9 he received a phone call from Morse indicating that the District had accepted Lawrence's six percent/six year proposal. And Lawrence has admitted in its post-trial briefs that Abate, in his July 8 telephone call, suggested terms of 64.64 percent at six percent interest over six years. Likewise, Lawrence has admitted in its briefs that on July 9 Morse communicated the trustees' vote to Finnegan.

Naturally, Lawrence attempts to draw different legal conclusions from these facts, but that is of no consequence to Lawrence's statute of frauds defense.

---

**12.** The District's attorney's insertion of additional language in the promissory note at some time after July 9 in no way indicates that the District itself did not manifest its intent on July 9 to be bound by the oral agreement. There was no evidence that the District had ever considered the additional language or had ever suggested its inclusion to the attorney; what the latter did later and on his own initiative has no bearing on the District's earlier manifest intent. In any case, that has no bearing on the crucial question of Lawrence's manifest intent on July 9.

What matters is that Lawrence has admitted the existence of the facts necessary to the formation of the oral agreement. *See Dehahn v. Innes*, 356 A.2d 711, 717–18 (Me.1976); *cf. Continental Can Co. v. Poultry Processing, Inc.*, 649 F.Supp. 570, 573–74 (D.Me.1986); Me.Rev.Stat.Ann. tit. 11, § 2–201(3)(b) (1964) ("If the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made," the contract is enforceable to the extent of the admission.). The purpose of the statute of frauds is primarily evidentiary, *see Restatement (Second) of Contracts*, Ch. 5, Statutory Note at 286 (1979), and to deny enforcement of an agreement despite the charged party's admission of the facts essential to the agreement's existence would be an impermissible use of the statute of frauds to perpetrate a fraud. *See Dehahn*, 456 A.2d at 718; *cf. Chapman v. Bomann*, 381 A.2d 1123, 1128 (Me.1978); *Gosselin v. Better Homes, Inc.*, 256 A.2d 629, 638 (Me.1969).

Finally, the statute of frauds defense fails because the District has fully performed its part of the bargain. "When one party to a contract has completed his performance, the one-year provision of the statute does not prevent enforcement of the promises of other parties." *Restatement (Second) of Contracts* § 130(2) (1979); *cf. Holbrook v. Armstrong*, 10 Me. 31 (1833) (holding that statute of frauds did not bar enforcement of agreement for sale of goods where goods were delivered within one year, even though price was to be paid at a time beyond one year). Here, the District's part of the bargain was that the District would not figure the lab expansion

costs into its rate base and thus raise Lawrence's monthly bills for so long as Lawrence operated in South Paris.[13] Despite the dispute over exactly how the District could do this, there is no question that Lawrence negotiated the agreement with the District in order to forestall the District from exercising its acknowledged right to seek payment for the lab expansion through a rate hike. And it is undisputed that after the agreement was reached, and for the remainder of Lawrence's period of operation in South Paris, the District never attempted to obtain payments from Lawrence in this manner.

For these reasons, Lawrence's statute of frauds defense fails, as have Lawrence's other defenses. Judgment for the District will therefore enter on the District's claim that Lawrence is in breach of the July 9, 1985 oral agreement to pay 64.64 percent of the lab expansion costs, plus six percent interest, over six years.[14]

## B. *The District's Claim for Treatment and Clean-up Costs*

The District argues that under the 1976 Agreement it is entitled to recover $19,-750.69 from Lawrence for treatment costs incurred from January to March of 1986.[15] Although the parties have stipulated that Lawrence's last waste discharge to the plant occurred in December of 1985, the District continued to treat that waste until January 10, 1986, and thus argues that it is entitled to payment for the entire first quarter of 1986. The District relies on Paragraph 14 of the 1976 Agreement, which obligates Lawrence to "pay its assessment for the operation and mainte-

**13.** The actual construction of the lab expansion might also be considered part of the District's performance. It was not part of the consideration for Lawrence's promise, because the District had an obligation to the BEP to complete construction irrespective of any payment agreement with Lawrence. It could, however, be considered a condition of Lawrence's performance. Because construction has been completed, the condition has occurred and Lawrence must therefore perform.

**14.** Because the parties never agreed on when the first payment would be due, the Court must now supply a reasonable term so that Law-

rence's liability may be computed exactly. Here, Lawrence expressed a preference for a September 1 date but was willing to leave to the District the choice between August 15 and September 1; the District preferred August 15. The Court concludes that August 15 is a reasonable starting date.

**15.** In its complaint, the District also sought recovery for certain clean-up costs incurred in 1986. The District has, however, failed to address this claim in its post-trial briefs; the Court thus considers the claim to have been waived.

nance expense for the full quarter year in which discharge of [Lawrence's] waste to the treatment facility last occurred...."

It is axiomatic that a contract must be interpreted according to the plain meaning of its words; here, the words plainly mean something other than what the District contends. The words "the full quarter year" plainly refer to the three-month periods commencing at the beginning of January, April, July, and October of each year. The phrase "*the* full quarter year *in* which discharge ... last occurred" (emphasis added) also indicates that the parties contemplated predetermined quarterly periods and that the final discharge, whether it occurred on the first, middle, or last day of one of "the" quarters, would fall "in" a quarter rather than triggering the start, or for that matter the end, of "a" three-month period.

Thus a final discharge at any point in a quarter obligated Lawrence to pay its assessment for the entire quarter, whether the discharge occurred on the first or last day of the quarter. If the final discharge occurred near the beginning of a quarter, Lawrence might pay for some District expenses not properly attributable to Lawrence's operations, whereas if the final discharge occurred near the end of a quarter, as in the instant case, the District might pay for some expenses properly attributable to Lawrence's operations. This may be unfortunate, but it is not unfair, because it is precisely the result for which the parties bargained.

The Court also notes that the District seeks to recover Lawrence's assessment for the entire month of March. If the District really believed its own theory, it would only attempt to recover Lawrence's assessment prorated through March 24, three months after Lawrence's final discharge. By seeking recovery for the entire month, the District unwittingly acknowledges that Lawrence's interpretation of the phrase "the full quarter year" is the correct one.

■ If the parties had intended that Lawrence's obligation continue for a three month period after its final discharge, instead of merely for the remainder of the quarter, they would have said "three months after discharge ... last occurred." The District argues that Lawrence is trying to read the word "calendar" into the phrase "the full quarter year," but the Court concludes that it is the District that impermissibly attempts to read the new words into the contract. And the District does so not to explain but to replace the words already there.

The District further argues that at the time of the 1976 Agreement, the parties knew that waste treatment commenced in one of the calendar quarters might continue into another quarter. The District concludes that the parties must have intended Lawrence's payment obligation to continue in such circumstances. The obvious answer is that if the parties had so intended, they would have said "the full quarter year in which ... treatment last occurred," or even "a full three months after ... treatment last occurred." They did not do so, however, and both parties are bound by the plain language to which they did agree. Judgment for Lawrence will therefore enter on the District's claim for January, February, and March, 1986 treatment costs.

### C. *Lawrence's Entitlement to Indemnification*

Lawrence seeks a declaration that it is entitled to contractual indemnification from the District for all costs incurred (including the ground water monitoring costs already incurred) as a result of the District's activities at the landfill on Lawrence's premises. Lawrence relies on Paragraph 21 of the the 1976 Agreement, in which the District agreed to operate the landfill "in accordance with all applicable Federal, State and local statutes, ordinances and regulations, and, further, [to] indemnify, save and hold [Lawrence] harmless from and against any and all liabilities and claims arising out of the activities conducted by the District on such premises." Because Lawrence has already expended over $60,000 on a ground water monitoring program at the landfill, and because the District refuses to reim-

burse Lawrence for the portion of these expenditures attributable to the District's use of the site, there is an "actual controversy" making declaratory judgment appropriate. 28 U.S.C. § 2201 (1982 & Supp. III 1985).

■ The District argues that the indemnification clause is unenforceable because Lawrence's own conduct with respect to the landfill was tortious or otherwise wrongful. In making this argument, the District relies on *Restatement (Second) of Contracts* § 195 (1979), which provides that a term exempting a party from tort liability for harm caused intentionally, recklessly, or (in some cases) negligently is unenforceable on grounds of public policy. However, the cited *Restatement* section by its own terms applies only to terms exempting a party from tort liability. It has no application to terms whereby a third party, not the victim of the tortious conduct, agrees to indemnify a party against tort liability. *See id.,* comment b; *see also Gatley v. United Parcel Service, Inc.,* 662 F.Supp. 200, 202–03 (D.Me.1987) (contrasting exculpatory and indemnification clauses).[16]

The District also argues that the indemnification clause is inapplicable here because it does not clearly require the District to indemnify Lawrence for the consequences of Lawrence's negligent or intentional acts. The District points to the Maine rule that

[i]t is only where the contract on its face by its very terms clearly and unequivocally reflects a mutual intention on the part of the parties to provide indemnity for loss caused by negligence of the party to be indemnified that liability for such damages will be fastened on the indemnitor, and words of general import

will not be read as expressing such an intent and establishing by inference such liability.

*Emery Waterhouse Co. v. Lea,* 467 A.2d 986, 993 (Me.1983). This Court has previously assumed that the same rule applies *a fortiori* to contracts assertedly providing for indemnity for a party's own intentional torts, *Gatley,* at 203, assuming *arguendo* that such contracts are enforceable at all.[17]

■ In the instant case, Paragraph 21 of the 1976 Agreement does not meet the *Emery Waterhouse* standard. It does not so much as mention harms that Lawrence might negligently or intentionally cause, let alone purport to require the District to indemnify Lawrence for such harms. The remaining question, then, is whether Lawrence negligently or intentionally caused any or all of the harms that have grown or may grow out of the District's activities at the landfill.

The difficulty with answering this question is that neither the parties nor the Court can say with any certainty exactly what harms have grown or may grow out of the District's activities at the landfill. Nor is there sufficient evidence in the record to determine what third parties have been or will be harmed. Paragraph 21 of the 1976 Agreement speaks of "liabilities and claims arising out of the activities conducted by the District on the premises," but at the present time, other than the ground water monitoring costs, Lawrence has not pointed to anything even arguably constituting such a claim or liability.

The District urges the Court to draw the broad conclusion that Lawrence was negligent, or caused intentional harm, simply by permitting or encouraging the District to use the landfill during the period prior to

---

**16.** The District also cites 6A A. Corbin, *Corbin on Contracts* §§ 1471–72 (1962 & Supp.1984), and 15 S. Williston, *A Treatise on the Law of Contracts* §§ 1749–49A (3d ed. 1972 & Supp. 1986), for the proposition that an agreement to indemnify a party for the party's own intentional, willful, grossly negligent, or otherwise tortious act contrary to a distinct public policy is unenforceable. Although this blanket proposition goes beyond what is aid in either of the cited sources, and has little direct support in Maine case law, it has much to recommend it.

But the Court's task in this diversity case is "to apply state law, not rewrite it." *Bonney v. Canadian Nat. Ry.,* 800 F.2d 274, 280 (1st Cir.1986). The Court therefore rests its decision on Paragraph 21's failure explicitly to provide for indemnification for the consequences of negligent or intentional tortious acts.

**17.** In the discussion herein, the Court means the phrase "negligently or intentionally" to include "recklessly" and "willfully."

October 1, 1979. During that period, although the District had obtained a series of temporary conditional permits from the BEP to operate the landfill, both the District and Lawrence knew that the BEP had found the site unsuitable for permanent landfill use. As each temporary permit was extended, the BEP incorporated conditions governing the use of the site and made it even plainer that the site did not meet minimum standards and had to be closed. On October 1, 1979, the final temporary permit expired, and the District urges the Court to conclude that certainly after this date Lawrence, by permitting or encouraging continued use of the landfill with full knowledge of the factual and legal situation, negligently or intentionally caused harm.

The Court simply cannot make such a blanket, abstract determination on this record. To the contrary, it is necessary to know what harms have occurred, how and when they were caused, and who was harmed. It may be, as the District urges, that Lawrence jointly with the District committed the tort of public nuisance or some other tort based on common law or the violation of applicable statutes or regulations. But until an injured person, property owner, or governmental entity comes forward, the parties and the Court have no way of knowing exactly what conduct of Lawrence must be evaluated. Nor is it presently possible to know the legal and factual background against which particular Lawrence actions must be evaluated, e.g., what BEP conditions were in effect, whether they were violated, whether Lawrence knew of any violations, and whether a given harm was caused by such violation.

The Court recognizes that it would be much simpler and cheaper for all concerned if the Court could issue a blanket declaration that Lawrence either did or did not negligently or intentionally cause the harms arising out of the District's activities at the site. Instead, the parties will have to settle or litigate that question if and when claims are made or liabilities accrue in the future. Although a final resolution now might seem desirable, it would be unfair to both parties for the Court to make such a determination on the present record.

The Court can, however, make the determination with respect to Lawrence's expenditure for ground water monitoring costs. This expenditure was required by the BEP and therefore constitutes a claim or liability within the meaning of Paragraph 21's indemnification clause. The remaining question is whether Lawrence negligently or intentionally caused the harm to grow out of the District's activities at the site, thus making ground water monitoring necessary.

■ The Court has no difficulty in concluding that Lawrence's conduct in this respect was, at the least, negligent. Lawrence was aware at least as early as 1975 that its site was unsuitable for permanent use as a landfill because the permeability of the soil made the landfill a threat to the ground water. And Lawrence was repeatedly reminded of this fact, and of the need to close the landfill, from the time the 1976 Agreement was signed up until the present. It appears that Lawrence learned as early as 1977 that the BEP required ground water monitoring at the site. Lawrence knew that after October 1, 1979 the use of the landfill violated applicable law, yet it took no steps to stop the District's use of the landfill, as Paragraph 21 gave it the right to do in such a situation. Nor did Lawrence otherwise attempt to reduce the threat of ground water contamination. Lawrence continued to operate the tannery throughout this period, generating a large proportion of the waste that the District deposited at the landfill.[18] The Court

18. The Court recognizes that if Lawrence had stopped the District from using the landfill, the District might have had nowhere to deposit its sludge. The District might then have refused to accept further discharges from Lawrence, and Lawrence might then have been forced to cease operations in South Paris. This chain of events would unquestionably have caused serious problems for the District and for Lawrence, but it does not establish that Lawrence was not, at the least, negligent in continuing to permit the creation of, and itself indirectly to create, the threat of ground water contamination on its premises. In determining how to exercise rea-

makes no determination of what Lawrence knew or should have known about the harm that contaminated ground water from its site had caused or might cause. The Court determines only that Lawrence failed to exercise ordinary care to minimize the threat of ground water contamination and that Lawrence thereby caused the ground water monitoring to become necessary.

The Court will therefore order the issuance of a declaration that (1) the indemnification clause of Paragraph 21 of the the 1976 Agreement between the parties is enforceable except to the extent that Lawrence seeks indemnification for harms that it caused negligently, recklessly, willfully, or intentionally, and (2) Lawrence at least negligently caused the threat of ground water contamination at the landfill on its premises and thus is not entitled to indemnification for the costs of ground water monitoring thereon.

### D. *Lawrence's Claim for an Accounting*

Lawrence, alleging that between 1981 and 1985 the District overcharged its customers, asks the Court to order an accounting to determine the amount of the overcharge and to order reimbursement of Lawrence's share of the overcharge. Lawrence claims that the District based its billings to Lawrence on inflated calculations of expenses and on an improper formula to determine certain sludge dewatering charges.

In this diversity case, where state law defines the underlying substantive rights, state law also governs the availability of equitable remedies such as an accounting. 19 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4513 & n. 71 (1982). Under Maine law, a court may order an accounting "'where there is not a

plain, adequate and complete remedy at law.'" *Graffam v. Wray,* 437 A.2d 627, 635 n. 12 (1981) (quoting and interpreting Me.Rev.Stat.Ann. tit. 14, § 6051(13) (1964)).[19] The Court assumes that Maine would adopt the rule that "[t]he right to an equitable accounting arises generally from the defendant's possession of money or property which, because of some particular relationship between himself and the plaintiff, he is obliged to surrender." 1A C.J.S. *Accounting* § 15 (1985).

■ The question, then, is whether Lawrence has an adequate remedy at law for its claim that its relationship to the District entitles it to money in the District's possession. In answering this question, the obvious starting point is the contract that governs the relationship between the parties. Under Paragraph 9 of the 1976 Agreement, Lawrence agreed to pay "its proportional share of the operation and maintenance costs to the District of its Water Pollution Control Facility, computed in accordance with the formula set forth on pages 11–A, 12–A and 13–A of the [Whitman & Howard] Report." Lawrence claims that the District's billing system was "improper," "inflated," "excessive," "imprecise," "careless," "unreliable," "inaccurate," and "untrustworthy." But conspicuously absent from this list of allegations is any claim that the District breached its contractual obligation of billing Lawrence in accordance with the formula from the Whitman & Howard Report. Nor does Lawrence so much as hint that a suit at law for breach of contract would provide an inadequate remedy. And Lawrence does not allege any other breach of duty on the part of the District, or any other relationship between Lawrence and the District, that would entitle Lawrence to recover money now in the District's possession.

sonable care to minimize the threat of ground water contamination, Lawrence had no right to rule out, as somehow "inherently unreasonable," the option of closing its operation altogether.

**19.** The Law Court in *Graffam* also indicated that "[t]he necessity for an accounting is a sufficient foundation for jurisdiction in equity." 437

A.2d at 635 n. 12 (citing *Hall v. Penley Bros. Co.,* 9 F.Supp. 936, 940 (D.Me.1935), *vacated on other grounds,* 84 F.2d 371 (1st Cir.1936)). But this Court does not read either *Graffam* or *Hall* as indicating that an accounting is available irrespective of the adequacy of a remedy at law. To the contrary, the "necessity for an accounting" only arises if legal remedies are inadequate.

Absent even these bare allegations, let alone supporting evidence, the Court will not order an accounting.

Lawrence repeatedly stresses the complexity of the District's billing system and the need for reference to a master, under Fed.R.Civ.P. 53(b), to unravel the District's accounts. The numbers themselves may be complicated, but Lawrence has had no difficulty in explaining in conceptual terms its allegations that the District inflated its expense calculations and used an improper formula to determine sludge charges. Yet Lawrence does not even attempt to explain how these practices ran afoul of the Whitman & Howard formula or the District's contractual or other obligations. Thus the cases cited by Lawrence, in which courts found a breach of contractual or other duty and then referred the case to a Rule 53(b) master for the computation of damages, are inapposite. This is not to say that an accounting may not be ordered to establish the existence as well as the amount of liability. But where, as here, a party has not alleged any specific basis for liability, no accounting is warranted.

The closest Lawrence comes to alleging a breach of contract is its statement in its post-trial reply brief that "Lawrence's claim is based on the District's contractual duty to charge the company fairly...." Construing this as a claim that the District has violated its general contractual duty of good faith and fair dealing, the Court concludes that Lawrence has failed to meet its burden on this point. Lawrence first complains that the District inflated its expense calculations by keeping "two sets of books" and failing to use audited financial reports in billing Lawrence. More specifically, Lawrence alleges that the District billed Lawrence based on a monthly calculation of operation and maintenance expenses that, when totaled, significantly exceeded the operation and maintenance expense figures given in the District's annual audited financial report. The Court concludes that the District has adequately explained these discrepancies by showing that some items properly categorized as operation and maintenance expenses in the monthly bills to Lawrence were properly

categorized otherwise in the annual audited financial reports. The Court also notes that it is hardly evidence of bad faith that the District did not have its books audited every month. Moreover, in 1982, the District offered Lawrence three billing options: a fixed monthly payment with a quarterly adjustment, a slightly higher fixed monthly payment with a semi-annual adjustment, or a monthly charge based on actual usage. Lawrence chose the third option, and thus can hardly blame the District for not using audited figures in its monthly bills.

Lawrence also claims that because the District accumulated a cash reserve, it must have somehow overcharged its customers, including Lawrence. But Lawrence has failed to show that the cash reserve was excessive, that its accumulation was in violation of the Whitman & Howard formula, or even that Lawrence actually contributed to the surplus. The Court also notes that internal Lawrence memoranda, dated February 19 and October 17, 1975, recognized that the District planned to accumulate operating capital or a sinking fund, that it was already doing so "through charges to the operating statement each month," and that Lawrence, "of course, could go along with this...." Lawrence can hardly claim that it was unaware of the District's efforts to accumulate a surplus, nor does it explain how these efforts were unfair or undertaken in bad faith.

Finally, Lawrence claims that the District used an improper formula to determine sludge dewatering charges. Specifically, Lawrence points to evidence that much of the so-called "primary" sludge attributable to Lawrence's tanning operations contained less water to begin with than the "secondary" sludge largely attributable to the District's other customers. Therefore, Lawrence's sludge was less expensive to dewater. The District, however, combined Lawrence's sludge with the other sludge for dewatering, in order to give the other sludge "strength" and "body," making dewatering of this other sludge easier and less costly. Lawrence argues that this

in turn must somehow have increased the cost of dewatering Lawrence's sludge—in other words, that the combined dewatering process effectively forced Lawrence to subsidize the dewatering of other customers' sludge.

The Court, however, is not persuaded that this is the case. There was no testimony that the combined dewatering process increased the charge to Lawrence; the evidence establishes only that the combined process was more economical for the District. Moreover, there was evidence that Lawrence on average contributed 96.8 percent of all sludge, including some "secondary" sludge. Yet, there is no suggestion that Lawrence paid the entire cost of dewatering all the sludge. It is thus not intuitively obvious that adding, for example, 3.2 pounds of secondary sludge contributed by other customers to 96.8 pounds of primary and secondary sludge contributed by Lawrence would increase the cost of dewatering Lawrence's sludge in any measurable degree.

■ Even if Lawrence had made some showing that the District's billing practices did not conform to its express obligations under paragraph 9 of the the 1976 Agreement, the Court would not order an accounting. This is because Lawrence has known or should have known for years about many of the billing practices of which it now complains, yet Lawrence paid its monthly bills without protest throughout the relevant period. Lawrence had the express right under Paragraph 9 to see an annual audit of the District's operations and to have reasonable access to the District's books and records. Lawrence does not claim that it was denied this right, and on some occasions the District, on its own initiative, provided financial information to Lawrence. Moreover, a Lawrence employee, John Barlow, served as a District trustee throughout the relevant period and was ideally situated to understand and raise questions about the District's billing practices. Finally, at several points the parties freely discussed proposed changes in the billing system, but on each occasion they agreed to continue using the Whitman &

Howard formula. The first sign of Lawrence's serious belief that it had actually been overcharged came when Lawrence filed its claim for an accounting on December 18, 1986, nearly a year after it ceased operations in South Paris and nearly eleven months after it paid its final bill from the District.

Under these circumstances, Lawrence's acquiescence in the District's course of performance would be given weight in interpreting the requirements of Paragraph 9. *See Bar Harbor & Union River Power Co. v. Foundation Co.*, 129 Me. 81, 86, 149 A. 801 (1930); *Restatement (Second) of Contracts* § 202(4) (1979). And Lawrence's tardiness in raising its objection, with consequent prejudice to the District's ability timely to correct any erroneous billing procedures before sending further bills, would weigh heavily in the Court's consideration of the equities and would lead the Court to deny the request for an accounting.

In sum, Lawrence has failed to show or even allege the breach of any contractual or other duty by the District, has failed to establish that its remedy at law is inadequate, and has repeatedly acquiesced in the District's billing procedures with consequent prejudice to the District. For each of these independent reasons Lawrence's claim for an accounting is *DENIED.*

### III. ORDER

It is therefore hereby *ORDERED:*

(1) That judgment enter for the District on the District's claim that Lawrence is in breach of the July 9, 1985 oral agreement to pay 64.64 percent of the lab expansion cost, plus six percent interest, over six years, the first payment being due August 15, 1985;

(2) That judgment enter for Lawrence on the District's claim for January, February, and March 1986 treatment costs and 1986 clean-up costs;

(3) That a declaration issue stating that (a) the indemnification clause of Paragraph 21 of the 1976 Agreement between the parties is enforceable except to the extent that Lawrence seeks indemnification for

harms that it caused negligently, recklessly, willfully, or intentionally, and (b) Lawrence at least negligently caused the threat of ground water contamination at the landfill on its premises and thus is not entitled to indemnification for the costs of ground water monitoring thereon;

(4) That Lawrence's request for an accounting is *DENIED;* and

(5) That a proposed judgment and declaration, to be agreed to by counsel as to form, be filed by the District within ten (10) days of this date.